SALVATORE R. GIOIA, as Administrator of the Estate of JOSEPH D. GIOIA, Deceased, Respondent, v. STATE OF NEW YORK, Appellant. (Claim No. 36174.)

Fourth Department, May 17, 1962.

*Louis J. Lefkowitz, Attorney-General* (*Jean M. Coon, Paxton Blair* and *Donald J. MacHarg* of counsel), for appellant.

*Darch, Noonan & Hughes* (*Millard J. Noonan* of counsel), for respondent.

HALPERN, J. The claimant's intestate was arrested on October 17, 1958, on a charge of having murdered his wife. While under questioning at the State troopers' barracks in the City of Batavia, he jumped out of a second floor window. As a result, he suffered a fracture of one of the bones of his ankle. It is an open question whether the decedent's purpose was to escape or whether it was to commit suicide. The trial court declined to find either way on this question. In any event, the Sheriff and the District Attorney interpreted the decedent's conduct as an attempt to commit suicide and, accordingly, they notified the St. Jerome Hospital in Batavia, to which the decedent was taken, that the decedent had suicidal tendencies and that he should be kept under constant guard. Subsequently, on October 21, 1958, the decedent was arraigned at the hospital on a charge of murder in the first degree and the City Court Judge ordered him committed to the Rochester State Hospital, pursuant to sections 658 to 662-f of the Code of Criminal Procedure to determine whether he was in such a state of insanity as to be " incapable of understanding " the nature of the charge against him and making his defense. Pursuant to this order, the decedent was transferred on October 23, 1958, to the Rochester State Hospital. The Sheriff notified the State hospital that, in his opinion and in the opinion of the District Attorney, the decedent had suicidal tendencies and offered to have Deputy Sheriffs stationed at the hospital to guard the decedent but the State hospital declined the offer, stating that the hospital staff was capable of providing the necessary surveillance.

Upon the decedent's admission to the State hospital on October 23, he was examined by a psychiatrist, who was called as a witness upon the trial. He testified that he had found the decedent " extremely reticent ". The decedent refused to answer any questions relating to the shooting of his wife, stating that he had been advised by his attorney not to talk to anyone about it but he answered questions relating to other matters. The psychiatrist testified further that the decedent's " speech was clear, relevant and coherent ". Emotionally he was " quite somber, serious, occasionally smiled appropriately in response to a jest ". " He denied delusions, hallucinations, misinterpre-

tations or any other type of symptoms indicative of mental aberration ". " In reviewing his past life, he denied any previous episodes of depression or hostility." "His memory and sensorium were intact ". The conclusion of the psychiatrist was that the decedent was " a sullen, morose man ". He was not " truly depressed in the classical sense of the word as we use it. He seemed to be sorry for what he did. That is one question that he did answer, that he was sorry for what he did ". A report was later submitted to the court pursuant to the code, by the two staff psychiatrists who had examined the decedent, finding that the decedent was " not in such state of idiocy, imbecility or insanity as to be incapable of understanding the charge against him or the proceedings or of making his defense ".

Upon his admission to the State hospital, the decedent was placed in a seclusion room in a cottage. In accordance with the direction of a doctor on the hospital staff, an ace bandage was placed on the decedent's injured ankle. The male nurse who was assigned to watch the decedent at midnight, October 25, was not aware of this fact. The door to the decedent's room was locked and the nurse checked every 15 minutes by looking through a small window in the door with the aid of a flashlight but he did not actually enter the room. When he looked in at 2:30 A.M., he did not detect any movement on the part of the decedent. He then entered the room and found that the decedent had strangled himself with the ace bandage which he had removed from his ankle and had wound tightly around his neck.

The Court of Claims awarded the sum of $40,000 for the wrongful death of the claimant's intestate and the sum of $1,124 for funeral expenses.

The evidence sustains the conclusion of the Court of Claims Judge that the hospital staff had not maintained adequate surveillance to prevent the decedent from committing suicide.

As to the amount of the award, the Attorney-General argues that the court erred in not taking into account in determining the damages for the decedent's death, the possibility or probability of his conviction of some form of homicide. As to this point, we believe that the Court of Claims Judge was right. It would be too speculative to attempt to determine by a postmortem inquiry whether the decedent would have been convicted of murder or some lower degree of homicide if he had lived and to take into account the conclusion on that point in determining the decedent's life expectancy or his prospective earnings.

There is, however, another aspect of the case, which leads us to reverse the judgment and to grant a new trial. It seems to

have been assumed by the parties and by the Court of Claims Judge that because the suicide had taken place in a State hospital the cases holding that the State is liable for failure to exercise care to prevent a mentally ill patient in a State hospital from inflicting injury upon himself are necessarily applicable here. But all those cases turn upon the initial fact that the patient was mentally ill. The self-inflicted injury or death in those cases was not the volitional act of a sane person but was the act of a person who was incapable of understanding the nature of his act or of resisting the insane impulse to commit it. This is the rationale of the State hospital suicide cases (see *Hirsh* v. *State of New York,* 8 N Y 2d 125, 127).

The proof in the present record did not establish that the decedent was mentally ill or that the suicidal act was the product of mental illness, and there was no finding to that effect. On the contrary, the proof indicated that the suicidal act was the result of the reasoned and deliberate determination of a sane person. The motivation of the act apparently was twofold: first, remorse for what he had done and, second, a desire to avoid trial and punishment.

The decedent was not committed to the State hospital as an insane person. He was there solely for observation by the psychiatrists, pursuant to the provisions of the Code of Criminal Procedure, to determine whether he was capable of standing trial. The case must be looked at in the same light as if the suicide had taken place while the decedent was in the State troopers' barracks, the county penitentiary or the St. Jerome Hospital.

The term " suicidal tendency " used by the District Attorney and the Sheriff in their warning letters is somewhat misleading in this connection. The word " tendency " suggests a psychogenetic cause for the suicide but the proof did not establish that there was such a cause. What was apparently meant by the warning of a " suicidal tendency " was that the decedent had shown a purpose or intention to commit suicide, but the proof indicated that this purpose or intention was the reasoned conclusion of a sane person who was overcome by remorse or who desired to escape trial and punishment.

It cannot be assumed that the act of suicide of itself established insanity, or temporary insanity, at the time of the commission of the act. "Insanity cannot be presumed from the mere fact of suicide for experience has shown that self-destruction is often perpetrated by the sane " (*Strasberg* v. *Equitable Life Assur. Soc.,* 281 App. Div. 9, 13). In the life insurance cases, it has been held that a stipulation in a policy excluding

death by suicide is operative unless " the insured at the time of his suicide was so far insane as to have been without appreciation of the physical consequences of his action or without power to resist the disordered impulse that impelled him to end his own life " (*Franklin* v. *John Hancock Mut. Life Ins. Co.*, 298 N. Y. 81, 84).

In the workmen's compensation cases and in the general tort cases, it has also been recognized that a suicidal act is often the act of a sane person exercising independent volition. " Awards which have been sustained have all been based on a showing of mental illness leading to the suicide " (*Matter of Aponte* v. *Santiago & Garcia*, 279 App. Div. 269, 274, quoted with approval in *Matter of Maricle* v. *Glazier*, 283 App. Div. 402, affd. 307 N. Y. 738). The leading case in New York is *Matter of Delinousha* v. *National Biscuit Co.* (248 N. Y. 93, 96) in which the court held that there could be no recovery for the death by suicide of an injured workman unless it were shown that " the suicide is not the result of discouragement, of melancholy, or other sane conditions, but of brain derangement ". The same principle is stated in section 455 of the Restatement of Torts: A wrongdoer who inflicts an injury upon another " is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity (a) prevents him from realizing the nature of his act * * * or (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason ". (Cf. the definition of insanity as a defense in criminal cases in the American Law Institute Model Penal Code, § 4.01: " A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law ".)

The liability of the State in this case turns upon the question of whether the decedent was sane or insane at the time he committed suicide. If he was insane, in the sense in which the term is defined in the authorities quoted above, the State may be held liable. But if it is found that the decedent committed suicide while he was sane, the State cannot be held liable.

Under the general principle expressed in the Latin maxim *volenti non fit injuria,* a sane person who deliberately inflicts an injury upon himself cannot recover damages from his custodian upon the ground that the custodian should have prevented him from committing the self-injury. The willful act of self-injury constitutes contributory fault on the part of the injured

person which bars a recovery, even though the custodian may also have been chargeable with fault.

Since no action will lie for an injury willfully inflicted by a sane person upon himself, no action will lie on behalf of his estate for the wrongful causing of his death, if the injury results in his death. Section 130 of the Decedent Estate Law authorizes an action for the wrongful causing of death only if the injured person could have recovered for the injury " if death had not ensued ".

We know of no case in this or in any other State in which a sane prisoner has been allowed to recover from his custodian for a self-inflicted injury on the ground that the custodian was at fault in failing to prevent the prisoner from inflicting the injury upon himself. " There is no liability where the injury sustained results solely from the acts of the prisoner himself " (72 C. J. S., Prisons, § 13, p. 865, citing *Kendrick* v. *Adamson*, 51 Ga. App. 402).

An analogy may be found in the cases denying recovery to prisoners upon the ground of contributory negligence. A person who is in custody is still bound to exercise care for his own protection and contributory negligence on his part will bar recovery for a negligently inflicted injury (*Melton* v. *State of New York*, 198 Misc. 654). Willful self-injury is, of course, a more aggravated form of misconduct than contributory negligence and *a fortiori* it bars recovery.

An analogy may also be found in the cases dealing with the consent by one person to the infliction of an injury upon him by another. The consent bars a recovery, unless the person so injured is incapable of giving consent, by reason of his immaturity or defective mental condition, or unless he belongs to a class which is deemed in law to be incapable of giving consent to an act of the particular type involved in the case. (*McCandless* v. *State of New York*, 3 A D 2d 600, 605, affd. 4 N Y 2d 797; 1 Restatement, Torts, §§ 59-61; Prosser, Torts [2d ed.], pp. 86-87.) Thus, if a sane adult person requests another person to maim him or even to cause his death, there can be no civil recovery for the resulting injury or death, although the person causing it would, of course, be guilty of breaching a public duty and his act would be punishable as a crime (Penal Law, § 2304; *McCandless* v. *State of New York, supra*; cf. *Williams* v. *State of New York*, 308 N. Y. 548, 556).

The issue of the defendant's mental condition at the time of his suicidal act was not tried out in the Court of Claims and was not passed upon by the Judge. The claimant asked for a finding that the decedent committed suicide while temporarily

insane but the Judge refused to make that finding. We, of course, have the power to make new findings on the subject, but, upon the present record, it is our opinion that a finding that the suicide was committed while the decedent was temporarily insane would be against the weight of the evidence. There were introduced into evidence without comment or explanation the Coroner's certificate of death and an "Accident Injury and Escape Report" by the Director of the hospital, both of which contained the statement that the death was caused by suicide "while temporarily insane". But no evidence was introduced to show that these conclusory statements were based upon the knowledge of any factual circumstances supporting the conclusion. The statements are therefore entitled to little weight as against the affirmative testimony by the psychiatrist who had examined the decedent two days before the suicidal act, that the decedent was not insane and showed no symptoms "indicative of mental aberration". The psychiatrist's report also states that "Psychological tests were performed" on October 24, 1958, the day following the psychiatric examination, and that "the findings indicated a shallow mood of depression with good emotional integration beneath his depressive-like exterior. His intelligence rating was within normal limits". There is nothing in the record to show that there was any subsequent examination or other basis for the conclusion that the decedent was insane at the time of the suicide.

The judgment appealed from should be reversed on the law and the facts and a new trial should be granted.

WILLIAMS, P. J. (dissenting). I do not disagree with the general principles of law stated in the prevailing opinion. Nevertheless, I would affirm the judgment appealed from.

There are in evidence two documents which would support a finding of fact that the claimant committed suicide while temporarily insane. The first is a document from the records of the Rochester State Hospital which contains a diagnosis of "Psychoneurosis, Reactive Depression". It also gives the nature and cause of suicide as "Asphyxiation by strangulation while temporarily insane". This is signed by Dr. Terrence, the Director of the State hospital, and bears the notation that it was submitted to the Commissioner of Mental Hygiene in accordance with General Order No. 12.

The second document is the official certificate of death, which also gives the immediate cause of death as "Asphyxiation by strangulation while temporarily insane". This latter certificate is presumptive evidence of the facts therein alleged. (Civ. Prac.

Act, § 367; Public Health Law, § 4103; *Brownrigg* v. *Boston & Albany R. R. Co.*, 8 A D 2d 140, 141.) There is nothing in the record to destroy the presumption of temporary *insanity at the time of death*. Nor may we say that the medical examiner, a physician, did not make a complete examination before he arrived at that determination. In any event there was no burden on the claimant, as inferred in the prevailing opinion, to overcome the presumption.

There is ample evidence of negligence on the part of the employees of the State hospital, and the record abounds with evidence that the claimant was possessed of suicidal tendencies and that the officials of the State hospital knew of such tendencies.

For these reasons the Court of Claims Judge should have made a finding that deceased was temporarily insane *at the time that he committed suicide*. The record would amply support a finding to that effect by this court. I would make such a finding and affirm.

BASTOW, McCLUSKY and HENRY, JJ., concur with HALPERN, J.; WILLIAMS P. J., dissents and votes for affirmance in opinion.

Judgment reversed on the law and facts and a new trial granted, without costs of this appeal to either party.