[Civ. No. 47133. Second Dist., Div. Two. July 21, 1976.]

HELEN LEE LUCAS, Plaintiff and Respondent, v.
CITY OF LONG BEACH et al., Defendants and Appellants.

COUNSEL

Leonard Putnam, City Attorney, Robert E. Shannon and Gerald Desmond, Deputy City Attorneys, for Defendants and Appellants.

Demler, Perona, Langer, Bergkvist, Lauchengco & Manzella and Major Alan Langer for Plaintiff and Respondent.

OPINION

**COMPTON, J.**—Plaintiff Helen Lee Lucas brought an action against the City of Long Beach and Sergeant C. V. Riley, a member of that city's police department for the wrongful death of her 17-year-old son Stephen. A jury returned a verdict in favor of plaintiff for the sum of $40,500. Defendants appeal from the judgment entered on the verdict.

At about 1:15 a.m., on August 20, 1971, two patrol officers of the Long Beach Police Department observed Stephen staggering across Pine Avenue, a major thoroughfare in that city. They stopped to investigate. Stephen failed to pass certain field sobriety tests and was transported to the city jail where he was booked for violation of Penal Code section 647, subdivision (f), and curfew.[1]

During the booking process, which consumed a period of about 15 minutes and which included the taking of a shower and changing into jail clothes, Stephen exhibited the symptoms of a moderately intoxicated person. A breathalyzer test, however, revealed the absence of any significant amount of alcohol in his system.

Stephen's speech was slurred, he swayed while standing and staggered as he walked, yet he did not fall. He appeared to understand and respond to questions asked of him and requests made of him. Stephen's clothes were disheveled and he had some scrapes and dried blood on his face. He explained to the officers that he had been in a fight. The officers were of the opinion that Stephen was under the influence of a drug. No medical examination was ordered.

---

[1]Penal Code section 647, subdivision (f), provides in pertinent part: "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: ... Who is found in any public place under the influence of intoxicating liquor, any drug, .... or any combination of any intoxicating liquor, drug . . . in such a condition that he is unable to exercise care for his own safety or the safety of others, . . . "

In the preceding 12 years the facility had handled some 75,000 juveniles including those under the influence of drugs without a single attempt at suicide.

At approximately 2 a.m., Sergeant Riley placed Stephen in a cell in the juvenile detention facilities. There was testimony that a cell nearer to the officer's duty station was available and in that cell Stephen would have been within sight of the officer. At about 4:55 a.m., Sergeant Riley, while making an inspection of the facility, found Stephen hanging by his neck with a noose constructed of a strip of cloth torn from a mattress cover. Stephen was dead. Examination of the mattress cover disclosed that the strip had been torn from the bottom thereof and the torn edges of the remaining portion had been tucked back in.

An autopsy revealed that the cause of death was asphyxia as a result of the hanging. There was no evidence of any other remarkable pathology. A test of the blood showed the presence of secobarbital, a commonly used sedative. Plaintiff elicited certain opinions from the autopsy surgeon concerning the properties of secobarbital generally but the doctor could not draw any conclusions concerning the effects of the drug on Stephen or the part it played in his suicide.

State regulations governing the administration of juvenile detention facilities require inter alia that inmates be observed by a custodian at least once each hour.[2] Admittedly Sergeant Riley did not comply with this regulation in his failure to check on Stephen between 2 a.m. and 4:55 a.m.

The jury's rationale for returning a verdict in favor of plaintiff is reflected by its responses to a number of special interrogatories. Because these responses deal with the critical issues in the case and point up the reasons why the judgment must be reversed we set them out verbatim and in their entirety.

"THE COURT REQUESTS THAT YOU ANSWER ALL OF THE QUESTIONS. NINE OR MORE OF THE JURORS MUST AGREE TO EACH ANSWER. ANSWER THE FOLLOWING QUESTIONS IN THEIR ENTIRETY:

"1. Was Sergeant Riley negligent in that, from the information available to him, he, as a reasonable man, should have foreseen the

---

[2]Standards for juvenile detention facilities promulgated by the California Youth Authority pursuant to Welfare and Institutions Code section 509.5.

likelihood of Stephen W. Lucas harming himself or taking his own life? Yes _____ No _X_

"2. Was the failure of Sergeant Riley to inspect a minimum of once per hour negligent conduct? Yes _X_ No _____

"3. Was the failure of Sergeant Riley to inspect, as required, a legal cause of Stephen W. Lucas attempting to and taking his own life? In other words, would a minimum inspection of once per hour between 2:00 A.M. and 5:00 A.M. have probably prevented Stephen W. Lucas from taking his own life? Yes _X_ No _____

"4. Was. Sergeant Riley negligent in that from the information available to him he did not utilize a cell available to him for holding Stephen W. Lucas other than the cell utilized? Yes _____ No _X_

"5. Was the failure of Sergeant Riley to utilize a cell other than the one used a legal cause of Stephen W. Lucas attempting to and taking his own life? In other words, would the use of another cell available probably have prevented Stephen W. Lucas from taking his own life? Yes _X_ No _____

"6. From the facts available to any police officer, should he, or they as reasonable men, have provided medical care and/or attention to decedent Stephen W. Lucas? Yes _X_ No _____

"7. Was the failure found above a legal cause of Stephen W. Lucas attempting to and taking his own life? In other words, would the providing of medical care and/or attention have probably prevented Stephen W. Lucas from attempting to and taking his own life in the manner accomplished in this case? Yes _X_ No _____

"8. From all of the facts available, was any negligent conduct of any employee or employees of the City of Long Beach in any possible combination a legal cause of the decedent Stephen W. Lucas attempting to and taking his own life? Yes _X_ No _____

"If nine or more of you agree, please state which act or combination of acts you so find:

"(1) The failure of Sgt. Riley to make his mandatory inspection, (2) Since Stephen Lucas was staggering, occasional slurred speech &

breathalyzer indicated only a trace of alcohol medical examination should have been made to determine cause.

"If you have made a finding establishing responsibility of either Sergeant Riley alone, or Sergeant Riley and the City of Long Beach, or the City of Long Beach alone (the liability of the City of Long Beach can be only on failure to provide medical care and/or attention), you shall next determine the following:

"9. Was the act of Stephen W. Lucas attempting to and taking his own life an intentional act done with the knowledge of the probable consequences thereof? YES_____ No__X__

"10. Was the act of Stephen W. Lucas in attempting to and taking his own life not an intentional act, but an act caused by the possible effect of all the facts on the decedent's mental processes so that he failed to realize the nature of his act or the certainty of risk or harm involved therein? YES__X__ No_____ If your answer is YES, answer the following:

"11. Did any negligent act of any employee or employees of the City of Long Beach affect the decedent's mental processes so that he failed to realize the nature of his act or the certainty of risk or harm involved therein? YES_____ No__X__ If your answer to No. 9 is No, and your answer to either No. 10 or No. 11 is YES, you shall proceed in assessing damages. If your answer to No. 9 is YES, and your answer to both No. 10 and 11 is No, you shall find for the defendants."

In summary the jury found that Stephen's suicide was not reasonably foreseeable and that Sergeant Riley was not negligent in selecting the cell in which Stephen was placed. These findings were proper because there was no evidence to the contrary.

On the other hand the jury found that Sergeant Riley's violation of the inspection regulation was negligent as was the failure to summon medical care and these negligent omissions "caused" the death, in that inspection or medical care would "probably" have prevented it.

Finally, the jury concluded that Stephen's act was not intentional because he failed to comprehend the consequences of his act.

We first address the question of whether this latter finding is legally supportable.

■ The undisputed evidence shows that Stephen was simply under the influence of a barbiturate. He suffered from no other physiological infirmity. It can be said that drug abuse and suicide both suggest the existence of a degree of emotional instability. Aside from that, however, there is no evidence that Stephen suffered from any psychoses or other mental illness.

The evidence that Stephen tore a piece of cloth from a mattress cover, then carefully replaced the edges of the cover and fashioned a noose sufficient to bear his weight points to a deliberate intentional act.

An average person of Stephen's age, possessed of normal intelligence, must be presumed to appreciate, even in an intoxicated state, the consequences of hanging himself. Impaired judgment is not the same as lack of intent.

Assuming that Stephen's conduct was the direct result of his ingestion of drugs, that ingestion was voluntary on his part.

■ In the criminal law voluntary intoxication, whether from drugs or alcohol, does not negate a general criminal intent and is no defense to a general intent crime such as assault. (*People* v. *Kelly,* 10 Cal.3d 565 [111 Cal.Rptr. 171, 516 P.2d 875].) It follows that in attempting to impose civil liability on another for injuries resulting from his own conduct, the injured party may not assert that, because of his own voluntary intoxication, his conduct was not intentional.

A somewhat analogous principle is to be found in recent cases dealing with actions brought against purveyors of alcoholic beverages. Third persons injured by the acts of inebriates may, under certain circumstances, recover from the person who provided the intoxicating liquor to the inebriate. (*Vesely* v. *Sager,* 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151].) The inebriate himself, however, may not recover for his own injuries. (*Carlisle* v. *Kanaywer,* 24 Cal.App.3d 587 [101 Cal.Rptr. 246]; *Cooper* v. *National Railroad Passenger Corp.,* 45 Cal.App.3d 389 [119 Cal.Rptr. 541]; *Rose* v. *International Brotherhood of Electrical Workers,* 58 Cal.App.3d 276 [129 Cal.Rptr. 736]; *Venzor* v. *Santa Barbara Elks Lodge, No. 613,* 56 Cal.App.3d 209 [128 Cal.Rptr. 353].)

■ The jury's finding that Stephen's act of taking his own life was not an intentional act simply has no support in the evidence.

■ The "cause" of Stephen's death was his own act in hanging himself. No act or omission of Sergeant Riley produced the mental condition which prompted Stephen to do what he did. *Tate* v. *Canonica,* 180 Cal.App.2d 898 [5 Cal.Rptr. 28], cited by plaintiff is totally inapposite. The issue here is whether the city or Sergeant Riley may be held liable for failing to take action which the jury found would "probably" have prevented the suicide.

■ The general rule is that a jailer is not liable to a prisoner in his keeping for injuries resulting from the prisoner's own intentional conduct. (72 C.J.S. Prisons, § 13; 60 Am.Jur.2d Penal and Correctional Institutions, § 29; also see *Gioia* v. *State,* 16 App.Div.2d 354 [228 N.Y.S.2d 127].) Absent some possible special circumstances a jailer is under no duty to prevent the latter from taking his own life.

■ We turn to the failure to summon medical care.

Government Code section 845.6 provides: "Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the *employee knows or has reason to know that the prisoner is in need of immediate medical care* and he fails to take reasonable action to summon such medical care." (Italics added.)

Government Code section 855.6 provides: "Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others."

■ These sections are cast in the form of immunity which are absolute except for the situation of a failure to provide medical care for a prisoner in obvious need of such care.

■ Although Stephen, during the course of the booking, evidenced emotional upset by crying and expressing concern as to the effect that his

arrest would have on his mother, there is not a scintilla of evidence in the record indicating that his conduct was any different than one might expect of a person intoxicated on either drugs or alcohol. The autopsy conclusively established that in fact Stephen suffered from no other pathology. Since Stephen manifested only the symptoms of intoxication, Government Code section 855.6 bars any claim based on the failure to have him examined medically.

Plaintiff, who had the burden of proof, offered no evidence as to what kind of medical care she claims should have been provided and more importantly she offered no evidence as to how such medical care could have prevented the death. Stephen was not in fact in need of immediate medical care and clearly lack of medical care did not "cause" the death.

█ True the continuous presence in the cell of a doctor, a nurse, or, for that matter, a policeman probably would have prevented the suicide. The jury apparently reasoned along these lines. Government Code section 845.6, however, in affixing liability for failure to summon "immediate medical care" for a person in need thereof envisions liability for injury resulting from the failure to treat the physical condition requiring treatment and not for some other incidental injury that might have been prevented by the mere presence of medical personnel. The jury's findings that it was negligence not to provide medical treatment and that that failure was the "cause" of death are not supported by any evidence to be found in the record.

█ Having concluded that Sergeant Riley was not negligent in failing to provide medical care and, as noted, that he had no general duty to prevent the suicide, we consider whether his failure to make the hourly inspection provides a special basis of liability.

We assume, as the jury found, that the failure was negligence. It is not necessary here to discuss the many possible circumstances in which that failure might give rise to liability. It seems clear that plaintiff's case founders on the element of causation.

It is axiomatic that for a person to be liable for another's injury the negligent conduct of the actor must be the legally recognizable cause of the injury. (Rest.2d Torts, § 430, p. 426.) The burden of proof on this issue rests with the plaintiff. (Rest.2d Torts, § 328A(c), p. 149; Prosser Law of Torts (4th ed.) p. 241.)

There was testimony from the autopsy surgeon that Stephen while hanging from the noose, could have survived up to 15 minutes. Allowing an additional 40 minutes for the fashioning of the noose there would have been time for the entire event to have occurred even if Sergeant Riley had made his hourly inspection.

Further, the act did not have to be completed within one hour but could have been interrupted by the officer's inspection and resumed after the officer had left.

The fact that the mattress cover was torn on the bottom and the ripped edges had been tucked back indicate a secretive intent on the part of Stephen so that it is doubtful that Sergeant Riley on any routine inspection would have discovered Stephen's preparations. Putting it in the converse, there is no evidence in the record from which it could reasonably be inferred that the hourly inspection would have prevented the suicide. The jury's finding was pure speculation.

The most that can be said concerning Sergeant Riley's negligence is that it provided a greater opportunity than already existed for Stephen to act. Stephen's death, however, required the intervention of an additional independent force, to wit, Stephen's intentional act.

The intentional act of a third person is a superseding cause of harm and relieves the original actor of liability unless such act was reasonably foreseeable or the failure to foresee such act was a factor in the original negligence. (Rest.2d Torts, § 448, pp. 480-482.)

In special interrogatory No. 1, the jury answered No when asked whether Sergeant Riley, from the information available to him, should have foreseen the likelihood of Stephen harming himself or taking his own life. This finding agrees with our previous discussion that Stephen's act was highly unusual and was not foreseeable. Thus it was superseding and the legal cause of his death.

The judgment, finding no support in the evidence or law, is reversed.

Fleming, Acting P. J., and Beach, J., concurred.

A petition for a rehearing was denied August 12, 1976. Fleming, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied September 29, 1976.