Filed 3/13/15  Wedgeworth  v. City of Newport Beach CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SANDY WEDGEWORTH et al., | |
| Plaintiffs and Appellants, | G048784 |
| v. | (Super. Ct. No. 30-2011-00493787) |
| CITY OF NEWPORT BEACH et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendants and Respondents. | |

It is ordered that the opinion filed herein on February 11, 2015, be modified as follows:

1.  On pages 6 through 7, delete the entire five paragraphs commencing with the second full paragraph on page 6 beginning with the words "The evidence that plaintiff," and continuing to the last paragraph of section I of the Discussion, and replace them with the following paragraphs:

The evidence that plaintiffs claim they needed to oppose the motion for summary judgment was certain documents from the City's investigation file of the

incident. The trial court determined that these documents were privileged and therefore were not required to be produced by defendants to plaintiffs. If the evidence was not discoverable, the motion to continue the hearing in order to obtain the evidence was properly denied. We therefore turn to the issue of the propriety of the court's discovery order.

In his third report, the discovery referee recommended that two documents from the investigation file need not be produced because they were privileged. The court approved the referee's recommendation, and made the recommendation and report the order of the court.

In his fifth report, the discovery referee recommended that the two privileged documents be produced by defendants because defendants had waived the attorney-client privilege that might have been applicable by (1) asserting in the 14th affirmative defense to the first amended complaint that the City had fully investigated the incident, and (2) the City attorney's statement, as quoted in a local newspaper, *ante*. The trial court sustained defendants' objections to the fifth report: "Defendant City's 14th affirmative defense is not an affirmative defense. A showing that Defendant City properly investigated the incident would not defeat Wedgeworth Plaintiffs' claims, nor would a showing that Defendant City concluded that the officers acted properly after its investigation. As such, the so-called affirmative defense is immaterial and irrelevant. [¶] The immaterial and irrelevant matter placed in Defendants' answer should not serve [as] a waiver of attorney client or work product privilege. Nor should the statement made by [the City attorney] serve as a waiver of privilege. The statement did not disclose anything of note."

The trial court did not abuse its discretion in determining the attorney-client privilege as to the two documents withheld from the investigation file had not been waived by the assertion of the 14th affirmative defense, or by the City attorney's statement to the press. First, defendants waived the 14th affirmative defense. Second,

2

the court correctly found that the propriety of the postsuicide investigation was not an affirmative defense to plaintiffs' claims against defendants. Finally, the court correctly found that neither the assertion of a proper investigation as an affirmative defense, nor a statement by the City attorney that the investigation exonerated defendants, waived any privilege or protection that applied to documents from the investigation file. Defendants established that they produced all documents from the investigation file other than those withheld on the grounds of privilege.

Because the evidence that plaintiffs claimed they needed to oppose the motion for summary judgment was privileged, the trial court did not err in denying the request to continue the hearing on the motion for summary judgment to enable plaintiffs to obtain those documents.

There is no change in the judgment.

The petition for rehearing is DENIED.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SANDY WEDGEWORTH et al., | |
| Plaintiffs and Appellants, | G048784 |
| v. | (Super. Ct. No. 30-2011-00493787) |
| CITY OF NEWPORT BEACH et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, William M. Monroe, Judge.  Affirmed.

Law Offices of Andrew A. Smits and Andrew A. Smits for Plaintiffs and Appellants.

Ferguson, Praet & Sherman, Peter J. Ferguson, Allen Christiansen; Pollak, Vida & Fisher and Daniel P. Barer for Defendants and Respondents.

\*         \*         \*

William Robert Wedgeworth (William) committed suicide while in the custody of the Newport Beach Police Department. William's wife, Sandy Wedgeworth (Sandy), and William's three surviving children (collectively, plaintiffs), sued the City of Newport Beach (the City) and several individual police officers (collectively, defendants) for negligence, wrongful death, and failure to obtain medical care for a prisoner. The trial court granted summary adjudication on two causes of action, and entered judgment on the pleadings on a third cause of action, in favor of defendants and against plaintiffs.

We affirm. Defendants established by admissible evidence that, on this record and in view of the applicable provisions of the Government Code, no duty existed to summon immediate medical care for William to prevent him from committing suicide. Plaintiffs did not raise a triable issue of material fact in opposition to the motion for summary adjudication. The trial court correctly granted the motion for summary adjudication, and the motion for judgment on the pleadings without leave to amend.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

On July 31, 2010, William was agitated, yelling, sweating profusely, and red in the face. He was forcing Sandy's hand into a fist and hitting himself in the face with her fist. Sandy called 911 to obtain medical care for William; she described him as "having another one of his crazy episodes."

Sandy reported William's behavior and a prior Welfare and Institutions Code section 5150 commitment to the 911 operator, and the police dispatchers provided the information by broadcast. Officers Matthew Wood, Sam Sa, and Spencer Arnold responded to William and Sandy's house. Officer Sa met with Sandy; Sandy advised Officer Sa of William's history of mental illness, prior section 5150 hold, and need for medication. Sergeant Arnold suspected William was under the influence of drugs.

2

The officers arrested William for domestic violence. Officer Jonathan Sunshine transported William to the jail in the basement of the police station. The arresting officers did not tell Officer Sunshine about their observations of William, the information regarding his prior Welfare and Institutions Code section 5150 hold, or his other contacts with the police.

When Officer Sunshine delivered William to the City's police department jail, he told the custody officers, Gerald Faludi and Diane Harris, that William had said his hands and feet were deadly weapons, and that William was a "5149" or "5149 and a half," meaning someone who appears mentally ill.

Officer Faludi took custody of William, inventoried his personal property, and prepared the booking paperwork. Officer Daran Kanbara performed a cursory medical screening of William. Officer Harris placed bed sheets in William's cell, and locked William in the cell about 6:00 p.m. Officer Harris did not place William in a safety cell, which is used for inmates who might be a danger to themselves. William was the only arrestee in the jail at that time.

The custody officers performed welfare checks on William once per hour while he was in his cell. William was found dead in his cell at approximately 10:00 p.m., having hung himself with his bed sheets.

A complaint was filed against the City and the officers involved in William's arrest and detention, seeking damages for wrongful death (first cause of action), negligence (second cause of action), and failure to obtain medical care for a prisoner (third cause of action).

Defendants filed a motion for summary judgment or, in the alternative, summary adjudication. The trial court granted the motion for summary adjudication as to the first and third causes of action, and treated the motion for summary adjudication of the second cause of action as a motion for judgment on the pleadings, which was granted without leave to amend. Judgment was entered, and plaintiffs timely appealed.

3

I.

*MOTION TO CONTINUE*

In their opposition to the motion for summary judgment, plaintiffs argued the trial court should deny or continue the hearing on the motion to enable plaintiffs to obtain essential evidence that might exist but could not then be presented.  The trial court denied the request.

"To mitigate summary judgment's harshness, the statute's drafters included a provision making continuances—which are normally a matter within the broad discretion of trial courts—virtually mandated '"upon a good faith showing by affidavit that a continuance is needed to obtain facts essential to justify opposition to the motion." [Citation.]'  [Citation.]" (*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 395.)  If the declaration or affidavit does not establish the need for a mandatory continuance, the trial court must exercise its discretion to determine whether good cause for a continuance has been shown.  (*Lerma v. County of Orange* (2004) 120 Cal.App.4th 709, 715-716.)

Plaintiffs' counsel's declaration supporting the request for a continuance of the summary judgment motion hearing reads, in relevant part, as follows:

"32.  I am informed and believe that there is a likelihood that controverting evidence may exist and is essential to opposing Defendants' motion for summary judgment or summary adjudication.  There apparently exists an investigation file maintained by the Defendants that may include essential evidence regarding the following:  Defendants' knowledge of Mr. Wedgeworth's mental illness; Defendants' willful, reckless or negligent disregard for Mr. Wedgeworth's health while he was in their care and custody; Defendants' failure to follow their own policies and procedures when detaining Mr. Wedgeworth, among other things.  Defendants' investigation file is in issue

4

in this action. Defendants have answered the [first amended complaint] by including a Fourteenth Affirmative Defense that provides as follows:

"'These answering Defendants allege that this incident was properly investigated and that the acts of all Defendants were in accordance with proper policies and all legal standards (emphasis added).'

"Defendants' Answer to [the] First Amended Complaint and Affirmative Defenses is dated November 28, 2012. In addition, Defendants have made representations to the public that they have conducted a thorough investigation into Mr. Wedgeworth's death and their investigation shows that . . . there was no wrong-doing on their part. At least one such public declaration appeared in the local Daily Pilot newspaper dated January 27, 2011. Defendant's City Attorney stated the following:

"' . . . This is a sad and tragic loss, said Newport Beach City Atty. David Hunt. "We take it very seriously, and we've done a thorough investigation into the circumstances underlying it. We concluded there was nothing we could've done to prevent it. The jail is safe, and our officers did their job correctly." (emphasis added)'

"33. Having made these representations to the Court, Plaintiffs and the general public, Defendants refuse to produce their investigation file to Plaintiffs. Plaintiffs propounded a document demand and brought a motion to compel production of the investigation file on December 13, 2012. On January 28, 2013, the Discovery Referee recommended granting Plaintiffs' motion. However, Defendants still refuse to produce their investigation file. In fact, Defendants have challenged the Referee's Fifth Recommendation to grant Plaintiffs' motion to compel. Defendants brought an ex parte application challenging the Referee's Recommendation on Wednesday, January 30, 2013. The Court continued the hearing on Defendants' application to February 21, 2013, the day of the hearing on this motion. Plaintiffs oppose Defendants' application and maintain they are entitled to the entire file, which is core evidence for trial regarding Defendants' Fourteenth Affirmative Defense.

5

"34. Plaintiffs await a ruling on this latest effort by Defendants to withhold production of their investigation file. Assuming the Court adopts the Discovery Referee's Recommendations, it may be at least four to six weeks before Plaintiffs obtain the file and obtain any follow up discovery, such as depositions concerning the file. A continuance of the hearing on Defendants' summary adjudication motion will allow Plaintiffs an opportunity to complete this discovery regarding Defendants' investigation file and fourteenth affirmative defense. The discovery bears directly on the issues presented in Defendants' summary adjudication motion and will be used in opposing the motion." (Boldface omitted.)

The evidence that plaintiffs claim they needed to oppose the motion for summary judgment was the City's investigation file of the incident. The trial court determined that the investigation file was privileged and therefore was not required to be produced by defendants to plaintiffs. If the evidence was not discoverable, the motion to continue the hearing in order to obtain the evidence was properly denied. We therefore turn to the issue of the propriety of the court's discovery order.

In his third report, the discovery referee recommended that the investigation file not be produced because it was privileged. The court approved the referee's recommendation, and made the recommendation and report the order of the court.

In his fifth report, the discovery referee recommended that the investigation file be produced by defendants because they had waived the attorney-client privilege that might have been applicable to the investigation file by (1) asserting in the 14th affirmative defense to the first amended complaint that the City had fully investigated the incident, and (2) the City attorney's statement, as quoted in a local newspaper, *ante*. The trial court sustained defendants' objections to the fifth report: "Defendant City's 14th affirmative defense is not an affirmative defense. A showing that Defendant City properly investigated the incident would not defeat Wedgeworth Plaintiffs' claims, nor would a showing that Defendant City concluded that the officers acted properly after its

6

investigation. As such, the so-called affirmative defense is immaterial and irrelevant. [¶] The immaterial and irrelevant matter placed in Defendants' answer should not serve [as] a waiver of attorney client or work product privilege. Nor should the statement made by [the City attorney] serve as a waiver of privilege. The statement did not disclose anything of note."

The trial court did not abuse its discretion in determining the attorney-client privilege as to the investigation file had not been waived by the assertion of the 14th affirmative defense, or by the City attorney's statement to the press. First, defendants waived the 14th affirmative defense. Second, the court correctly found that the propriety of the postsuicide investigation was not an affirmative defense to plaintiffs' claims against defendants. Finally, the court correctly found that neither the assertion of a proper investigation as an affirmative defense, or a statement by the City attorney that the investigation exonerated defendants, waived any privilege or protection that applied to the investigation file.

Because the evidence that plaintiffs claimed they needed to oppose the motion for summary judgment was privileged, the trial court did not err in denying the request to continue the hearing on the motion for summary judgment to enable plaintiffs to obtain the investigation file.

II.

*MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION*

A.

*Standard of Review*

We review an order granting summary adjudication de novo. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 35.) A motion for summary adjudication is properly granted if the moving papers establish there is no triable issue of material fact as to a cause of

7

action, an affirmative defense, or the existence of or lack of a duty, and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subds. (c), (f); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843.)  "To prevail on the motion, a defendant must demonstrate the plaintiff's cause of action has no merit.  This requirement can be satisfied by showing either one or more elements of the cause of action cannot be established or that a complete defense exists.  [Citations.]  If the defendant meets this requirement, the burden shifts to the plaintiff to demonstrate a triable issue of material fact exists.  [Citations.]"  (*We Do Graphics, Inc. v. Mercury Casualty Co*. (2004) 124 Cal.App.4th 131, 135-136.)

The court's order granting judgment on the pleadings is also reviewed de novo.  (*Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 296-297.)  Judgment on the pleadings should not be granted if there is a reasonable possibility that a defect in the complaint can be cured by amendment.  (*Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113, 118; *La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1141.)  The burden of proving a reasonable possibility of amendment is on the plaintiff.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  We review the trial court's decision to grant the motion for judgment on the pleadings without leave to amend for abuse of discretion.  (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1277.)

B.

*Existence of a Duty*

All of plaintiffs' causes of action—wrongful death, negligence, and negligent violation of the duty to obtain medical care for a prisoner—sound in tort.  The first questions are therefore whether defendants owed a duty to plaintiffs and, if so, the nature of that duty.

8

The Government Claims Act, Government Code section 810 et seq., limits the instances for which a public entity may be held liable for injury caused by it or by one of its employees. (All further statutory references are to the Government Code, unless otherwise specified.) Specifically, the City is immune from any lawsuits alleging injury to a prisoner, unless the facts of the case fall within certain specified exceptions: "(a) Notwithstanding any other provision of this part, except as provided in this section and in Section[] . . . 845.6 . . . , a public entity is not liable for: [¶] . . . [¶] (2) An injury to any prisoner. [¶] . . . [¶] (d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission." (§ 844.6, subds. (a), (d).) As used in section 844.6, "injury" includes death. (*Lowman v. County of Los Angeles* (1982) 127 Cal.App.3d 613, 615-616.)

The principal focus of each of plaintiffs' negligence-based causes of action is defendants' failure to summon medical care for William. Section 845.6 provides immunity to both the public entity and its employees for "injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody," unless the public employee "knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." (§ 845.6.)

"Section 845.6 is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employees' malpractice in providing that care. . . . Thus, section 845.6 creates out of the general immunity a limited cause of action against a public entity for its employees' failure to *summon* immediate medical care only. [Citation.]" (*Castaneda v. Department of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1070.)

"Liability under section 845.6 is limited to serious and obvious medical conditions requiring immediate care. [Citations.]" (*Watson v. State of California* (1993) 21 Cal.App.4th 836, 841; see *Lucas v. City of Long Beach* (1976) 60 Cal.App.3d 341,

9

349-350 [prisoner who exhibited symptoms of intoxication during booking process did not require immediate medical care, so public entity was not liable for prisoner's suicide in jail cell].)

Whether a public employee knows of a prisoner's need for immediate medical care and whether the employee's actions in summoning or failing to summon medical care were reasonable are generally factual questions for a jury. (*Castaneda v. Department of Corrections & Rehabilitation*, *supra*, 212 Cal.App.4th at p. 1073; *Zeilman v. County of Kern* (1985) 168 Cal.App.3d 1174, 1184-1187 [triable issue of material fact existed regarding county's liability under section 845.6, so summary judgment reversed]; *Johnson v. County of Los Angeles* (1983) 143 Cal.App.3d 298, 317 [error to sustain demurrer on section 845.6 claim]; *Hart v. County of Orange* (1967) 254 Cal.App.2d 302, 307-309 [affirming jury verdict in favor of heirs in wrongful death action because substantial evidence supported jury's finding that county was not immune from liability].) We therefore consider whether defendants established, as a matter of law, that plaintiffs could not prove this element of the claim.

Defendants offered in evidence the declarations of all the officers involved in arresting, transporting, and jailing William on July 31, 2010. Each of those declarants attested that he or she did not know or have reason to know William was in need of medical care, much less immediate medical care, at any time that day, and did not know or have reason to know of any suicidal ideation on William's part. The intake screening form completed by Officer Kanbara noted that William responded in the negative when asked whether he had ever tried to harm himself or take his own life, was currently thinking of harming himself, was receiving psychological treatment, or had any medical problems the police needed to know about. Officer Kanbara's declaration stated that William did not appear upset during the intake screening, and was cooperative in answering all the questions.

10

Did plaintiffs offer admissible evidence creating a triable issue of material fact? Plaintiffs' conclusory responses to defendants' separate statements of disputed material facts read, in relevant part, "[t]here were indications that Mr. Wedgeworth was suicidal or had suicidal tendencies while in the presence of Def[endants] Arnold, Wood, Sa or Sunshine prior to being transported to the jail on July 31, 2010. Def[endant] Sunshine described Mr. Wedgeworth as a '5149.' Def[endants] observed Mr. Wedgeworth's mental illness behaviors and were informed of it by NBPD dispatchers and Mrs. Wedgeworth. Def[endants] had records of Mr. Wedgeworth's history of prior contacts with NBPD involving mental illness, a prior 5150 committal [*sic*], suicide attempts and ideations." Plaintiffs offered the following evidence in disputing defendants' separate statements:

(1) Transcriptions of dispatch calls regarding the incident at Sandy and William's home on July 31, 2010, in which: (a) Sandy informs the 911 operator that William was "having another one of his crazy episodes," had "been 5150'd before," had a "borderline personality disorder," and was "just crazy"; (b) the police dispatcher informs the officers the 911 caller's husband was "acting strangely, has some sort of disorder"; (c) the police dispatcher tells the fire department a female called to report "her husband is acting strangely," and "bipolar behavior and all there previously"; (d) the police dispatcher advises responding officers, "William has priors for 245, 243, and 415 as well and a CII per loc info . . . . Bipolar behavior"; and (e) the police dispatcher advises the responding officers that in a previous call, William had told the officers his hands and feet were deadly weapons.

(2) An arrest report prepared by Officer Wood, reading in relevant part as follows: "The male seemed extremely agitated. He had a very red face and was sweating profusely. He was difficult to talk to because he continued to yell about his children and how his wife didn't get the air fixed in her car. . . . [¶] . . . When Sgt. Arnold began to walk inside the residence to check on Officer Sa, Wedgeworth became increasingly

11

agitated and asked him not to go into his house. He began yelling for his kids to come outside. He yelled that he would have to move out of the neighborhood and sell his house. He yelled that his children were being traumatized because the police were in his house. Sgt. Arnold informed Wedgeworth that he was going inside to check on the other Officer. I had to redirect Wedgeworth's attention to me in order to calm him down. When Sgt. Arnold returned about 1 minute later, Wedgeworth made the statement, 'My hands and feet are lethal weapons. I was trained to kill with one punch. One time, my wife was making me angry and I punched the bed post and broke it. I told her that is what would happen to a man if I punched him.' [¶] . . . [¶] . . . I asked him if he was ill or injured. He stated he was not. I asked him if he had any psychological issues for which he took medications. He told me he was supposed to be taking medications, but was not. I asked him what medication he was supposed to take and he did not answer me. [¶] . . . [¶] . . . He also stated that the camera would not photograph his real injuries. Sgt. Arnold asked him what he meant and he stated he had emotional injuries."

(3) A report prepared by Officer Faludi reading, in relevant part: "Wedgeworth brought into NBPD Jail by Ofc. Sunshine on 7/31/2010 . . . . At that time, Ofc. Sunshine mentioned to me that Wedgeworth was '5149' and that he had stated his hands and feet are deadly weapons and they could kill someone in one second. I relayed this information to Ofcs. Harris and Kanbara as a matter of officer safety. . . . My contact with him lasted no more than 15 seconds and he did not say anything to me at that time. I did not notice anything unusual about Wedgeworth's demeanor."

(4) A records check form prepared when William was booked at the City's jail that showed he was committed under Welfare and Institutions Code section 5150 in 2009, and had been arrested for violating Penal Code section 245 (assault with a deadly weapon) in 2003.

12

(5) A coroner's report, noting, in relevant part, that the coroner was advised by police personnel that William "had a medical history of hypertension, bipolar disorder, explosive anger disorder, and multiple suicidal ideations with previous 5150 contacts."

(6) The police department's policy regarding prisoner suicide prevention, which reads: "Any prisoner displaying suicidal behavior or deemed a suicide risk will be transported to Orange County Jail . . . or a Psychiatric Assessment Center IMMEDIATELY. [¶] . . . At the time of receiving, the Custody Officer on duty should be alert to any symptoms that may indicate that a prisoner is a suicide risk. These symptoms include depression, refusal to communicate, verbally threatening to kill or hurt himself/herself, or any unusual behavior that may indicate that the prisoner may harm himself/herself while in custody. [¶] . . . The Custody Officer should notify the Watch Commander at intake if he/she feels the prisoner might be a suicide risk. The Watch Commander will arrange the transfer of the prisoner to Orange County Jail . . . or a Psychiatric Assessment Center. [¶] . . . If it becomes necessary to confine the prisoner while awaiting transportation and the prisoner is not combative or exhibiting bizarre behavior, the prisoner should be housed in a cell with another prisoner. Otherwise, the prisoner should be housed in the Safety Cell with monitor until transportation to one of the facilities. [¶] . . . The Custody Officer should make an entry on the prisoner's 'Pre-Booking Medical Screening Form' and 'Custody and Identification Report' (Post-It Note) indicating that the prisoner is a 'suicide risk.' The Custody Officer will make a physical check on the prisoner at least every fifteen (15) minutes or more and record it on the 'Inspection Log/Safety Cell Log.'" (Newport Beach Police Department, Jail Operations Manual (Sept. 2011) Medical Treatment Bookings, § 405.)

None of the foregoing evidence offered by plaintiffs showed William was suicidal or had suicidal tendencies or ideations, or that defendants had any more information about William's prior mental state than that, at some point in the past, he had been subjected to a Welfare and Institutions Code section 5150 hold. Plaintiffs also filed

a separate statement of additional undisputed material facts in opposition to the motion for summary judgment. That separate statement, however, did not cite any new or different evidence than referenced *ante*, that would be relevant to the issue whether any of defendants knew or had reason to know William was in need of immediate medical care.

Having reviewed the appellate record de novo, we conclude plaintiffs failed to raise a triable issue of material fact regarding whether defendants knew or had reason to know William was in need of immediate medical care. While the evidence clearly shows William was at least emotionally disturbed and possibly suffering from a mental illness, this does not mean he was necessarily suicidal or in need of immediate medical or psychological care.

Plaintiffs also alleged in the first amended complaint that defendants were negligent by failing to make regular welfare checks on William in his jail cell. Defendants offered admissible evidence that they made hourly welfare checks as required by California Code of Regulations, title 15, section 1027,[1] which plaintiffs do not dispute.

Plaintiffs contend that a duty to William arose on the part of defendants pursuant to sections 1052, 1055, and 1209 of title 15 of the California Code of Regulations.[2] These sections do not apply because plaintiffs did not offer any admissible

---

[1] California Code of Regulations, title 15, section 1027 provides, in relevant part: "A sufficient number of personnel shall be employed in each local detention facility to conduct at least hourly safety checks of inmates through direct visual observation of all inmates and to ensure the implementation and operation of the programs and activities required by these regulations. There shall be a written plan that includes the documentation of routine safety checks."

[2] California Code of Regulations, title 15, section 1052 provides: "The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures to identify and evaluate all mentally disordered inmates. If an evaluation from medical or mental health staff is not readily available, *an inmate shall be considered mentally disordered for the purpose of this section if he or she appears to be a danger to himself/herself or others or if he/she appears gravely disabled*. An evaluation from medical or mental health staff shall be secured within 24 hours of identification or

14

evidence that William appeared to be a danger to himself or others or that he displayed

behavior revealing an intent to cause physical harm to himself or others. The evidence

that William told the police officers his hands and feet were deadly weapons does not

show he had an intent to cause himself or others physical harm. Given the number of

police officers who interacted with William on July 31, 2010, if he had any intent to use

at the next daily sick call, whichever is earliest. Segregation may be used if necessary to protect the safety of the inmate or others." (Italics added.)

California Code of Regulations, title 15, section 1055 provides: "The safety cell described in Title 24, Part 2, Section 1231.2.5, shall be used to hold only those *inmates who display behavior which results in the destruction of property or reveals an intent to cause physical harm to self or others*. The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures governing safety cell use and may delegate authority to place an inmate in a safety cell to a physician. [¶] In no case shall the safety cell be used for punishment or as a substitute for treatment. [¶] An inmate shall be placed in a safety cell only with the approval of the facility manager, the facility watch commander, or the designated physician; continued retention shall be reviewed a minimum of every eight hours. A medical assessment shall be completed within a maximum of 12 hours of placement in the safety cell or at the next daily sick call, whichever is earliest. The inmate shall be medically cleared for continued retention every 24 hours thereafter. A mental health opinion on placement and retention shall be secured within 24 hours of placement. Direct visual observation shall be conducted at least twice every thirty minutes. Such observation shall be documented. [¶] Procedures shall be established to assure administration of necessary nutrition and fluids. Inmates shall be allowed to retain sufficient clothing, or be provided with a suitably designed 'safety garment,' to provide for their personal privacy unless specific identifiable risks to the inmate's safety or to the security of the facility are documented." (Italics added.)

California Code of Regulations, title 15, section 1209, subdivision (b) provides: "Unless the county has elected to implement the provisions of Penal Code Section 1369.1, *a mentally disordered inmate who appears to be a danger to himself or others, or to be gravely disabled*, shall be transferred for further evaluation to a designated Lanterman Petris Short treatment facility designated by the county and approved by the State Department of Mental Health for diagnosis and treatment of such apparent mental disorder pursuant to Penal Code section 4011.6 or 4011.8 unless the jail contains a designated treatment facility. Prior to the transfer, the inmate may be evaluated by licensed health personnel to determine if treatment can be initiated at the correctional facility. Licensed health personnel may perform an onsite assessment to determine if the inmate meets the criteria for admission to an inpatient facility, or if treatment can be initiated in the correctional facility." (Italics added.)

15

his hands and feet as deadly weapons, he had plenty of opportunities to do so. Even if those "threats" were real, not every threat of violence against an arresting police officer can justify treating the prisoner as mentally disturbed.

Plaintiffs also contend that the police department's policy manuals, which require that welfare checks on mentally disordered detainees be performed twice every 30 minutes, create a duty that defendants breached. The police department's policy manuals cannot create a duty of care because there is no evidence they were passed by the Legislature or adopted pursuant to the Administrative Procedure Act (§ 11340 et seq.). (Evid. Code, § 669.1; *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 720-721; *Strong v. State of California* (2011) 201 Cal.App.4th 1439, 1451-1452.)[3]

At the hearing on the motion for summary judgment, when the court announced it would treat the motion for summary adjudication of the second cause of action as a motion for judgment on the pleadings, plaintiffs requested leave to amend the first amended complaint: "Well, if the court is treating it as a motion for judgment on the pleadings, then plaintiffs request leave to amend. And we certainly can do so showing all the duties that are set forth in the policy manual and the breaches as set forth in our abundance of evidence submitted to the court and cited in our plaintiffs' separate statement." As explained *ante*, however, the police department's policy manuals cannot create a duty of care.

The trial court did not abuse its discretion by denying the request for leave to amend. The court did not err in granting the motion for summary adjudication of the first and third causes of action.

---

[3] The policy manuals would be admissible to prove breach of an existing duty, however. (*Lugtu v. California Highway Patrol*, *supra*, 26 Cal.4th at pp. 720-721; *Strong v. State of California*, *supra*, 201 Cal.App.4th at pp. 1451-1452; *Minch v. Department of California Highway Patrol* (2006) 140 Cal.App.4th 895, 908.)

16

Neither *Giraldo v. Department of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231 (*Giraldo*) nor *Lum v. County of San Joaquin* (E.D.Cal. 2010) 756 F.Supp.2d 1243, both cited by plaintiffs, requires a different result. In *Giraldo*, the plaintiff prisoner, a transgender inmate who identified herself as female, was repeatedly beaten and raped by her male cellmate, despite her complaints to prison officials. (*Giraldo*, *supra*, at p. 237.) Among other claims, the plaintiff sued for negligence. (*Ibid.*) The trial court sustained a demurrer to the negligence cause of action because there was no special relationship between a prisoner and a jailer, and therefore no duty arose. (*Id.* at pp. 237, 242.) The appellate court reversed the trial court's order sustaining the demurrer: "[T]here is a special relationship between jailer and prisoner which imposes a duty of care on the jailer to the prisoner." (*Id.* at pp. 252-253.) *Giraldo* did not address the issue which is presented here—whether the immunity created by section 845.6 prevents liability from defendants to plaintiffs under the circumstances of this case. The demurrer in *Giraldo* had also raised the issue of the immunity of the defendants (*id.* at p. 241), but the trial court apparently did not reach the issue, and the appellate court did not address it. Moreover, *Giraldo* addressed only the propriety of sustaining a demurrer based on the face of the plaintiff's complaint, and did not test the evidence supporting the plaintiff's claims. Therefore, *Giraldo* is of limited use in our review of the present case.

In *Lum v. County of San Joaquin*, *supra*, 756 F.Supp.2d at page 1246, the decedent was arrested and held in the San Joaquin County Jail. While the decedent was in the jail, the police officers observed the decedent having hallucinations and suffering a seizure. (*Id.* at pp. 1246-1247.) The defendant police officers released the decedent about six hours after his arrest, without ever obtaining medical treatment or a medical or psychological evaluation of him. (*Id.* at p. 1247.) Several days later, the decedent's body was found in the San Joaquin River; he had drowned. (*Ibid.*) The decedent's parents sued the county, the city, and the individual police officers for, among other things,

17

wrongful death.  (*Id.* at p. 1253.)  The district court denied the defendants' motion to dismiss the wrongful death claim on the ground a special relationship existed between a jailer and a prisoner.  (*Id.* at pp. 1254-1255.)  As with *Giraldo*, the motion considered only whether the claim for relief could be dismissed as a matter of law, and did not consider whether the undisputed material facts showed the plaintiffs could not establish their claim.  And, also like *Giraldo*, the district court in *Lum* did not consider the immunity created by section 845.6.

Further, the out-of-state cases cited by plaintiffs regarding a duty to prevent prisoner suicides are not binding on this court, and are contrary to California statutory and decisional law.

## C.

### *Judgment on the Pleadings*

The trial court treated the motion for summary adjudication of the second cause of action as a motion for judgment on the pleadings, and granted it.  The court concluded that plaintiffs' cause of action for negligence was the same as their cause of action for wrongful death caused by negligence.  The court also noted that to the extent plaintiffs intended to assert the negligence cause of action as a survival action on William's behalf, they had failed to comply with the notice of claims procedures of Code of Civil Procedure section 377.32.

Plaintiffs argue that the trial court erred in granting the motion because (1) the negligence cause of action was based on section 815.2, which makes public entities vicariously liable for their employees' negligence, and (2) plaintiffs, as William's wife and children, are in a class of persons who are the reasonably foreseeable victims of defendants' negligence.  Plaintiffs fail to show how the lack of a duty under section 845.6 can be overcome, no matter who the plaintiffs are, or whether the public entity or its

18

employees committed the allegedly negligent acts or omissions. The court did not err in granting the motion for judgment on the pleadings of the second cause of action.

Plaintiffs also argue that the trial court abused its discretion by failing to grant them leave to amend their complaint. In the trial court, plaintiffs requested leave to amend to allege the duties they claimed were created by the police department's policy manuals. As explained, *ante*, there is no evidence the manuals were passed by the Legislature or adopted pursuant to the Administrative Procedure Act, and, therefore, they cannot create a duty that would supersede the grant of immunity under section 845.6. (Evid. Code, § 669.1; *Lugtu v. California Highway Patrol*, *supra*, 26 Cal.4th at pp. 720-721; *Strong v. State of California*, *supra*, 201 Cal.App.4th at pp. 1451-1452.) The trial court did not abuse its discretion in denying the request for leave to amend.

D.

*Additional Arguments*

Plaintiffs argue the motion for summary judgment and/or summary adjudication was procedurally defective because each defendant filed a separate statement of undisputed material facts, rather than filing one single statement. Code of Civil Procedure section 437c, subdivision (b)(1) does not preclude multiple parties from filing their own separate statements, and any party joining another's motion for summary judgment must file his, her, or its own separate statement. (*Frazee v. Seely* (2002) 95 Cal.App.4th 627, 636.) The individual separate statements filed by each defendant did not violate Code of Civil Procedure section 437c, subdivision (b)(1).

Plaintiffs contend that the notice of the motion for summary judgment and/or summary adjudication was defective because it failed to repeat each of the issues on which summary adjudication was sought 12 separate times to address the 12 separate statements of undisputed material facts. The notice addressed each cause of action and each issue on which summary adjudication was sought, and was proper.

19

Plaintiffs also argue the summary judgment motion should have been denied because it was based on the same arguments defendants raised in two earlier filed demurrers. We reject outright any contention that a trial court's order overruling a demurrer bars a later summary judgment motion raising the same or a similar argument.

DISPOSITION

The judgment is affirmed. In the interests of justice, no party shall recover costs on appeal.

FYBEL, J.

WE CONCUR:

O'LEARY, P. J.

BEDSWORTH, J.

20