Filed 2/17/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAVID COLLINS,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>COUNTY OF SAN DIEGO et al.,<br><br>   Defendants and Appellants. | D077063<br><br><br>(Super. Ct. No. 37-2017-00028981-CU-PN-CTL) |

APPEAL from a judgment and orders of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Thomas E. Montgomery, County Counsel, Christopher J. Welsh and Jeffrey P. Michalowski, Deputy County Counsel, for Defendants and Appellants.

Niddrie Addams Fuller Singh and John S. Addams; Law Offices of Robert Vaage, Robert V. Vaage and Elizabeth H. Teixiera, for Plaintiff and Respondent.

This case arises from serious injuries sustained by David Collins after he was arrested by San Diego County Sheriff's Deputies for public intoxication.  After a three-week trial, the jury found in favor of Collins on his negligence claims against the two deputies involved in the arrest and two nurses employed by the County of San Diego (County) who attended to

Collins while in jail. On appeal from the subsequent judgment and the denial of its motion for judgment notwithstanding the verdict (JNOV), the County raises five claims of error: (1) the jury's finding that the deputies had a reasonable basis to arrest Collins foreclosed his claim of negligence against the deputies; (2) the court erred by instructing the jury it could find the deputies liable for injuries caused by private physicians who treated Collins after he was released from custody; (3) the court erred by failing to instruct the jury it could not hold defendants liable for an injury Collins sustained while in jail; (4) governmental immunity requires reversal of the judgment against one of the nurse defendants; and (5) the court erred in its calculation of the amount of setoff the defendants were entitled to based on Collins's prior settlement with the private physicians and their employer. We reject these arguments and affirm the judgment.

## FACTUAL BACKGROUND

At the time of his injuries, Collins was 30 years old, single, and living in an apartment in Encinitas with two roommates. Collins, who grew up in Carlsbad, was a construction worker, with a specialty in sheet metal roofing. In October of 2016, Collins drove to Indiana to visit his sister. During the trip, Collins had a cold and was using NyQuil and DayQuil to treat his symptoms. After he returned home, Collins was still sick and continued to rely on the same over-the-counter medications. Throughout the month of November he remained ill and isolated at home, primarily staying by himself in his room. During trial, Collins testified that during this time, he mostly watched movies and played video games.

Collins's roommate and long-time friend, Kline Fisher, noticed that throughout early November and up to the night of Collins's injuries, Collins was acting sick, staying in his room, and not engaging socially as much as he

2

would normally. Days before he suffered the serious injuries at issue in this case, Collins told his other roommate, Richard Huth, that he was sick. On the day of his arrest, Kline and another close friend, Alex Brinkman, received text messages from Collins that were odd, and that worried both Kline and Brinkman. Brinkman received some texts from Collins that were illegible and another in which he said he was hanging out with Jerry Seinfeld. Brinkman, who grew up with Collins, wondered at one point if Collins might be intoxicated or hallucinating. Brinkman had never experienced Collins acting in such a bizarre manner.

The day of Collins's arrest, a Friday, Huth texted Collins around 6:30 p.m. from his work to let him know that some friends were coming to their house to hang out before going out in downtown Encinitas. Huth invited Collins along, but Collins did not respond. Huth got home from work shortly after, around 7:00 p.m., and got into the shower. Collins was home and around the time of Huth's arrival, had called 911 and reported there were two homeless people in his bed. The dispatch operator noted Collins was slurring his words and was difficult to understand.

Within 10 minutes of the call, three sheriff's deputies arrived at Collins's house. Collins came outside to meet with the officers, which included defendants David Sanchez and Matthew Chavez. Sanchez spoke with Collins, while the other two officers went inside, guns drawn, to check for intruders. At trial, Sanchez stated he could not specifically recall his interaction with Collins, but did think that Collins's speech was slurred and he smelled of alcohol.

Huth, totally unaware that Collins had called 911, was showering when the officers knocked on the bathroom door and directed him outside. Sanchez and Chavez then met with Huth and Collins together. The officers explained

3

to Huth that Collins had called 911 and reported an intruder was in the house.  At trial, Chavez testified that Huth told him Collins "has been binge drinking all week, and he probably was just . . . seeing people that weren't there, imagining people in the house."  Sanchez also recalled Huth mentioning "that Collins had been binge drinking over the last week."  Huth testified he did not think he told the deputies that Collins had been drinking that day since he had not seen Collins all day, and did not remember saying that Collins had been binge drinking over the past week.  Sanchez recalled that before leaving, Huth told Sanchez he would stay with Collins while he "slept it off."  Huth did not recall exactly what he told the officers about staying with Collins, but guessed he said he would be home for a while.  Both deputies assumed that Collins was drunk.  They were at the residence for around nine minutes.

Once the sheriff's deputies left, Huth observed Collins acting strangely. His motor skills and speech were impaired, and Collins seemed to be hallucinating, telling Huth that Amy Schumer was in the house.  Huth was not sure what was wrong.  He called Fisher, a paramedic who was at work at the time, to tell him what had happened and to see when Fisher would be home.  Huth also knew that Fisher had contact information for Collins's parents in case they needed to be reached.

Huth's three friends arrived at the house and Collins stayed in the common area with them for a little while.  Huth and his friends did not see Collins drink any alcohol.  Huth continued to think something was wrong with his roommate, who did not seem to be oriented to the situation.  One of Huth's friends, Kathryn Lorentz, had met Collins before and testified that he seemed disoriented and was not making sense when he spoke.  Lorentz speculated at the time that Collins might be under the influence of drugs.

4

Huth's other friend, Sarah Meyer, who had never met Collins, also witnessed his strange behavior and also thought he might be under the influence of a drug.

After a little while, Collins left the group, went into his room and got into bed. Huth, assuming Collins was asleep, and his friends left the house around 10:00 p.m. Huth thought Fisher would be home shortly. Fisher got home from work around 10:45 p.m., but when he arrived Collins was not there. Fisher tried to call Collins, but found his phone and wallet were still at the house. Kline then called Collins's father, Joe Collins, who lived nearby and explained the situation. Joe and his wife Ann, Collins's mother, came over right away.

Collins's parents and Fisher went into Collins's room and discovered it was cluttered and messy, though this was not unusual. Inside there were several empty beer cans and Gatorade bottles that appeared to be filled with urine. The beer did not seem to have been recently consumed. Joe called 911 and discovered that Collins was in jail.

At some point after Huth and his friends left, Collins wandered outside towards a convenience store located 200 yards, and just two houses, from his home. A passerby saw Collins stumble and fall into a planter and called 911. A fire engine with a three-person crew (a fire truck engineer, fire captain, and a paramedic) arrived first, around 10:20 p.m. The paramedic, David Dumain, made contact with Collins and began to assess him. The fire department engineer, Miguel Garcia, recalled seeing Collins, who was sobbing, standing near the planter where he had fallen. An ambulance was also called to the scene and standing by.

Within minutes, officers Sanchez and Chavez and several other patrol cars arrived. The officers were responding to a call from the dispatcher for

5

medical assistance. Chavez, with Sanchez's assistance, had just arrested another individual involved in a domestic dispute, who was in Chavez's car waiting to be taken to the Vista Detention Facility. When Chavez heard the call about Collins, which he thought might also involve an arrest, he diverted his course and went to the scene. At trial he stated: "So I drove over there, since it's my beat on the way, and checked on the scene. [¶] I realized that it was the same person from earlier in the evening. And then, you know, did my quick eval of him and then determined that he also was going to be arrested for public intoxication."

Sanchez recalled that when he arrived at the scene, the paramedics were speaking with Collins. At trial, Sanchez could not remember whether the paramedics completed their assessment before he took Collins into custody. He testified that he could have detained Collins before the paramedics were finished "pending Deputy Chavez's decision on what was going to happen next . . . ." Chavez testified he could not remember anything about his interactions with Collins independent of what he reviewed in the documents from that day, except for the fact that Huth had told him Collins had been binge drinking. After the officers arrested Collins, Chavez changed the reason for the call in the department's computer system from medical assistance to an arrest for public intoxication.

Chavez took Collins and the other arrestee to the Vista jail. A booking photo was taken, and Collins was transferred to the nurse's station for an intake screening. Jonathan Symmonds, a registered nurse employed by the County, conducted the screening in his role as the intake nurse. Like the sheriff's deputies, at trial, Symmonds stated he had little independent recollection of his interactions with Collins. Symmonds was with Collins for five to ten minutes, and during that time completed a medical intake form.

6

On the form, Symmonds marked "yes" to Collins being injured, noting he had fallen in a parking lot and had minor abrasions. Symmonds also marked that Collins was not alert or oriented, and was intoxicated. Symmonds explained at trial that he knew Collins was intoxicated based on his conversation with Chavez, not on his interaction with Collins. Symmonds also testified that during his interaction with Collins, Collins was subdued and did not seem to know where he was. Symmonds decided Collins would be safe in jail and after his assessment, Collins was placed in a regular holding cell.[1]

Around 6:30 a.m. the next morning, a deputy making rounds saw Collins bleeding from his forehead. The deputy took Collins to the jail's nursing station, where he was assessed by another registered nurse, Roela Carolino, who determined that Collins had a small abrasion, but was otherwise fine, and put a band-aid on his head. The deputy who brought Collins to Carolino noted in his report that Collins was not making sense and initially could not explain how he got the cut on his head. Collins finally told the deputy he had fallen.

After Carolino finished her examination, the same deputy was assigned to escort Collins back to the regular holding cell. As the deputy walked with Collins, Collins's gait was unsteady and he was incoherent. He told the deputy that an FBI agent in the holding cell had held a gun to his head and then girls had beaten him up. The deputy decided to move Collins to a sobering cell and Carolino changed her assessment and requested that Collins be seen by jail's physician that morning. Carolino did not tell the

---

[1]    Symmonds testified that whether an inmate needs to be placed into a sobering cell, which has extra padding and is more protected, is usually made by the sheriff's deputy before the person is seen by the intake nurse. Other members of the jail's staff confirmed the same.

7

physician that Collins needed to be seen urgently, though at trial admitted she could not rule out that he was suffering from a brain injury. While in the sobering cell, the deputies checked on Collins approximately every 15 minutes. Nothing irregular was noted in the observation checklist.

Almost four hours after being placed in the sobering cell, and before Collins was seen by a physician, Carolino checked on him again. She concluded there was no need for immediate medical care, though she noted that Collins refused to answer some of her questions and so she could not completely assess his mental condition. Carolino wrote in her report that Collins indicated he had used "all kinds of drugs" and that he didn't know what he had taken exactly. Carolino did not think that Collins was in any medical distress.

The jail's physician, Quoc Tran, M.D., visited Collins in the sobering cell just before the end of his shift, which ran from 8:00 a.m. to 12:00 p.m. Dr. Tran spoke with Collins through the cell's glass door. He was not informed of Collins's hallucinations or incoherent statements, or that he had fallen and injured his head. Based on his visit with Collins through the door, Dr. Tran did not think any additional care was needed.

About an hour after Dr. Tran's visit, Collins stumbled backwards, falling inside the cell and hitting his head again. Carolino was called to the cell to assess Collins, who was conscious but lying on the ground. The paramedics were called and arrived soon after. Collins was discharged from the jail and transported to the hospital by ambulance.

At the hospital, Collins was diagnosed with hyponatremia, a severely low sodium level, and a subarachnoid hemorrhage, or brain bleed, to his frontal lobe. Toxicology testing indicated that Collins did not have any drugs or alcohol in his system. Collins's expert medical witness, Ronald Fisk, M.D.,

8

opined the hyponatremia was likely a result of a chronic viral infection coupled with Collins's use of NyQuil, which is known to trigger an electrolyte imbalance.[2] Dr. Fisk also opined that the subarachnoid hemorrhage and resulting brain injury likely exacerbated the condition. At the time Collins arrived at the hospital, his sodium level was 101, which both parties' medical experts agreed was extraordinarily low. One expert, who had treated hundreds of patients with hyponatremia, testified it was the lowest sodium level he had ever seen.

The doctors at the hospital worked to increase Collins's sodium levels, but in doing so raised the level too quickly and triggered a life-threatening condition called osmotic demyelination syndrome (ODS). The result of the ODS was further serious and irreparable brain injury.[3] The brain damage from both injuries significantly affected Collins's physical and cognitive function. In the first few days of his lengthy hospitalization, Collins's condition seemed to be improving. But within days of being admitted to the hospital, his condition worsened significantly as the damage caused by the

---

[2] The defense's expert opined the hyponatremia was more likely the result of chronic alcohol abuse, creating a condition called "beer potomania." He described beer potomania as a "critically low sodium level caused by excessive consumption of beer accompanied by a failure to take in sodium through food." Aside from the empty beer cans Collins's parents and Fisher found in his room the night of the arrest, there was no evidence that Collins was an alcoholic or a chronic abuser of alcohol.

[3] Dr. Fisk described ODS as the consequence of too rapidly correcting low sodium. If sodium is increased too quickly, "the brain begins to die." Dr. Evans explained that ODS causes the protein lining of the neurons that allow the brain to transmit information efficiently to start to slough off, killing the neurons. The physical manifestation of the injury takes two to three days to appear.

ODS took hold. Collins remained hospitalized until early January, and then was moved to a rehabilitation facility. Collins was released from rehab on January 31, 2018, and moved into his parents' home.

Thereafter, Collins continued to undergo considerable outpatient therapy. He also worked on his own and with his parents to improve his cognitive and physical abilities. By the time of trial, Collins's speech remained severely impaired and he had significant difficulty communicating. Because of the severity of his brain injury, Collins was unable to work and struggled with normal day-to-day activities he once enjoyed. At trial, his medical experts opined that Collins would need substantial medical care throughout his life, and around the clock care by the time he reached 60 years old.

## PROCEDURAL BACKGROUND

Collins brought suit against the County and four of its employees, Chavez, Sanchez, Carolino, and Symmonds.[4] Collins asserted 12 causes of action, including wrongful arrest pursuant to title 42 of the United States Code, section 1983.1, general negligence, and professional negligence. Collins named Palomar Health, the operator of the hospital where he was treated, and four doctors employed by Palomar Health as defendants on the cause of action for professional negligence. Before trial, Palomar Health and its doctors settled with Collins for $2,750,000.

The case proceeded to trial against the two sheriff's deputies and the two nurses, who were defended by the County. At the conclusion of the three-week trial, the jury was instructed on a special verdict form that contained

---

[4]    Collins also named another sheriff's deputy present at his arrest, Steven Block, but dismissed Block during trial.

10

three claims: (1) Negligence against deputies Chavez and Sanchez; (2) professional negligence against nurses Symmonds and Carolino; and (3) unlawful arrest against Chavez and Sanchez.

The jury concluded that the deputies were negligent and their negligence was a substantial factor in causing harm, and that both nurses were negligent in their diagnosis and treatment of Collins and their negligence was a substantial factor in causing harm. The jury rejected Collins's unlawful arrest claim, finding that the deputies had "a reasonable basis at the time of [Collins's] arrest to believe he was under the influence of alcohol, drugs or a combination of both" and "had a reasonable basis . . . to believe [Collins] was in a condition that he was unable to care for his own safety or the safety of others." The jury allocated the percentages of fault as follows:[5]

| Carolino | 30% |
|----------|-----|
| Chavez | 16% |
| Sanchez | 14% |
| Symmonds | 40% |
| Collins | 0% |

The jury awarded Collins total damages of $12,617,674. It apportioned damages among lost earnings ($71,519), future lost earnings ($1,100,318), medical expenses ($256,185), future medical expenses ($3,189,652), past noneconomic losses ($500,000), and future noneconomic losses ($7,500,000). Thereafter, the court entered judgment on the jury's verdict.

---

[5]     The jury was not asked to allocate the fault of the settling parties.

11

The defendants filed a notice of intent to move for judgment notwithstanding the verdict, or a new trial. They also moved for a reduction in damages based on the Medical Injury Compensation Reform Act of 1975 (MICRA) and for a setoff for the settlement Collins reached with Palomar Health and its doctors. In addition, the County filed three motions for JNOV or new trial: (1) a motion on behalf of Chavez and Sanchez asserting inconsistency in the jury's verdict, (2) a motion on behalf of Symmonds asserting Symmonds was immune from liability, and (3) a motion on behalf of all defendants asserting that two instructional errors and misconduct by Collins's counsel required a new trial.

After briefing and a hearing, the court denied the motions for JNOV or new trial. The court granted the unopposed motion for a reduction in damages based on MICRA, and reduced the noneconomic damage award with a setoff from the settlement, awarding Collins total damages of $6,261,174. The court rejected the setoff calculations proposed by the County, which contained additional reductions based on MICRA. Thereafter, the court awarded costs and entered an amended judgment for $6,417,990.56. The County was included in the judgment based on its stipulation to vicarious liability for Chavez and Sanchez and as a judgment debtor on behalf of Carolino and Symmonds under Government Code section 844.6, subdivision (d).[6] The County filed two notices of appeal, the first challenging the court's denial of its motions for JNOV or new trial and the second challenging the amended judgment.

---

[6] Subsequent undesignated statutory references are to the Government Code.

12

## DISCUSSION

On appeal, the County raises the same arguments it advanced in the trial court on its motion for JNOV or new trial. It first argues the jury's verdict is fatally inconsistent because Chavez and Sanchez cannot be held liable for negligence where the jury also found a reasonable basis for the arrest. The County next asserts the court made two prejudicial instructional errors concerning liability for the injuries Collins sustained in the hospital and in jail. Third, it argues Symmonds was immune from liability under section 855.6. Finally, the County asserts the trial court did not sufficiently reduce the damage award to account for Collins's settlement with Palomar Health and its physicians. As we shall explain in further detail, we reject each of these arguments.

## I

The County contends the court erred by denying its motion for JNOV or new trial because the jury's finding that Chavez and Sanchez had a reasonable basis to arrest Collins was fatally inconsistent with its determination the officers were negligent. The County further asserts that Collins's alternate theories of liability do not save the negligence verdict. Specifically, the County argues that Collins abandoned the theory of liability based on failure to summon medical care before trial and that the deputies' failure to communicate their earlier interaction with Collins is nonactionable nonfeasance.

Collins responds that the jury's verdict was not inconsistent because the deputies' interference with the paramedics' evaluation was conduct distinct from the lawful arrest. Collins also responds the jury's verdict was properly based on the deputies' failure to recognize that Collins needed urgent medical care, and their failure to communicate with the paramedics or

13

the jail's medical staff about their earlier interaction with Collins, critically the fact that he was hallucinating.

A

"[T]he purpose of a JNOV is 'to prevent the moving defendant from the necessity of undergoing any further exposure to legal liability when there is insufficient evidence for an adverse verdict.' " (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 794.) "The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. [Citations.] The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' " (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110; accord, *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

"On appeal, we review the motion de novo. '[W]e determine whether substantial evidence supported the verdict, viewing the evidence in the light most favorable to the party who obtained the verdict. [Citation.] We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the verdict, and do not weigh the evidence or judge the credibility of witnesses.' " (*Linear Technology Corp. v. Tokyo Electron Ltd.* (2011) 200 Cal.App.4th 1527, 1532.)

## B

"Public employees are liable for injuries resulting from their acts or omissions to the same extent as private persons, except where otherwise exempted or immunized by law. (§ 820.) Public entities are correspondingly liable for the negligent acts or omissions of their employees acting within the scope of their employment except where either the employee or the public entity is immunized from liability by statute. (§ 815.2.)" (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 264.) " 'To prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. [Citation.]' " (*Id.* at pp. 264-265.)

In the context of an arrest, if probable cause exists, there can be no claim for negligence based on that arrest. In other words, the arrest itself is not actionably negligent so long as the officer had probable cause to make the arrest. (*Salazar v. Upland Police Dep't* (2004) 116 Cal.App.4th 934, 947 (*Salazar*).) As the County points out, a "plaintiff may avoid this bar only if he pursues a viable negligence theory that is fundamentally distinct from his false arrest claim."

## C

Here, the jury determined that there was a reasonable basis for Chavez and Sanchez to believe that Collins was intoxicated and also that Collins posed a danger to himself or others. Accordingly, the jury rejected Collins's claim for false arrest. The County argues these findings foreclosed Collins's negligence claim against the deputies because that claim was also based on the lawfulness of the arrest. The County argues both claims rest on the contention "that deputies Chavez and Sanchez shouldn't have arrested

15

plaintiff, and should instead have done nothing, leaving him with the paramedics." To support this theory of the claim, the County looks to Collins's closing argument and Collins's inability to differentiate the harm caused by his negligence claim from the harm caused by the false arrest.

As an initial matter, the record does not support the County's characterization of Collins's closing argument as basing the negligence claim on the arrest. Collins's trial counsel, Robert Vaage, argued the following in closing concerning the negligence claim:

> "Were [Chavez and Sanchez] negligent? Yes. They took him away from the paramedics. They didn't perform their own assessment. They didn't ask him any questions. They didn't do their job. And the reality here is all they had to do was nothing. All they had to do was stay out of the way, let the paramedics do their job, and the rest of this never happens. Instead they decided to intervene without assessing him themselves, without asking him any questions."

Vaage's argument to the jury was that the officers were negligent by *assuming* that Collins was intoxicated based on their earlier interaction, and deciding that they needed no further information to act. In contrast, with respect to the false arrest claim, Vaage argued distinctly that the officers did not have a reasonable basis to believe Collins was intoxicated or that he represented a danger to himself or others (arguments the jury rejected). Only *after* addressing these first two questions on the special verdict form, did Vaage turn to the form's third question on causation, stating: "Was the conduct of the deputies in arresting Mr. Collins a substantial factor in causing him harm? Yes. Because if they don't arrest him and let the paramedics do their job, he goes to the hospital, and none of the rest of this happens." This closing argument presented two discrete theories of liability, negligence by interfering with the paramedics assessment, and separately that the deputies lacked probable cause to arrest Collins.

16

The County also asserts that the fact that the resulting harm from the two causes of action were the same (i.e., lack of prompt medical attention for Collins's hyponatremia) shows the negligence claim was based on the unlawful arrest. However, the fact that the resulting harm in this case, explained in terms of causation of injuries for the unlawful arrest claim, is the same for both claims does not mean that Collins's negligence claim was *based* on the false arrest. Tellingly, the County cites no authority in support of this assertion.

The case the County relies on primarily for this argument, *Salazar*, sheds light on the distinction that exists here and supports rejection of the County's argument. In *Salazar*, the Court of Appeal affirmed summary judgment of the plaintiff's claim of "negligence per se, consisting of falsely arresting plaintiff without probable cause . . . ." The plaintiff was arrested for felony assault with a deadly weapon, a car, after her involvement in a road rage incident. (*Salazar*, *supra*, 116 Cal.App.4th at p. 940.) Eventually, the district attorney brought charges of misdemeanor hit-and-run and reckless driving. The plaintiff then brought a government claim against the city, which was rejected, followed by a civil suit alleging the police had fabricated probable cause for her arrest, arrested her based on her sex and ethnicity, and negligently arrested the plaintiff. (*Ibid.*)

Shortly after filing her civil complaint, the plaintiff authorized a stipulation in the criminal matter agreeing the arresting officer had probable cause for the arrest. (*Salazar*, *supra*, 116 Cal.App.4th at p. 940.) Thereafter, on the district attorney's recommendation, the court dismissed the charges in the interest of justice. (*Ibid.*) The city then moved for summary judgment of the plaintiff's civil claims based on the probable cause stipulation and governmental immunity. (*Ibid.*) In affirming the trial court's order granting

17

summary judgment, the Court of Appeal held that the probable cause stipulation barred the plaintiff's claim for negligence "since a finding of the absence of probable cause to stop and arrest plaintiff [wa]s a prerequisite to" her negligence claim that was *explicitly* based on false arrest. (*Id*. at p. 947.)

Here, in contrast, the existence of probable cause was not a prerequisite to Collins's negligence claim. The deputies could simultaneously have probable cause to arrest Collins, but also have negligently interfered with the paramedics, preventing Collins from receiving critical medical care. Vaage advocated for a finding of negligence based on this theory when he explained the verdict form to the jury during his closing argument, and the evidence before the jury was sufficient to support this theory of liability.[7]

Specifically, fire captain Adams, one of three fire department personnel who arrived on the scene first, testified that when Chavez and Sanchez arrived, they "instantaneously" arrested Collins and "when they arrived on scene, the first thing that I saw was they cuffed him." Adams also testified that he did not think that Dumain had the chance to take Collins's vital signs. Adams recalled that when the deputies handcuffed Collins, there was a brief exchange between the paramedic, Dumain, and deputies in which he

---

[7]    These facts also distinguish this case from the federal district court opinions the County cites in support of its position. None of these cases concern a claim of negligent conduct distinct from the arrest. (See *Bulfer v. Dobbins* (S.D. Cal., Feb. 7, 2011, No. 09-CV-1250 JLS POR) 2011 WL 530039, at *13 [Granting summary judgment of negligence claim based exclusively on unlawful arrest.]; *Struk v. Bush* (S.D. Cal., Nov. 18, 2011, No. 10 CV 0348 MMA POR) 2011 WL 5827196, at *10 [Same.]; *Harvey v. City of Fresno* (E.D. Cal., Mar. 9, 2010, No. 1:08-CV-01399-OWW-DLB) 2010 WL 892114, at *15 [granting motion to dismiss negligence claim based on arrest, and dismissing the claim to the extent it was not based on the arrest for failing to allege the breach of a duty.].)

18

overheard one of the deputies state " 'We'll take it from here.' "  In addition, Adams estimated just two minutes passed from the time the deputies arrived until the time Collins was handcuffed.[8]

Dumain himself could not recall his interactions with Collins, Chavez, or Sanchez, and could testify only that he did not remember an instance of law enforcement personnel interrupting an assessment.  Dumain admitted that his normal practice for a person exhibiting the same symptoms as Collins (thick, slurred speech, disorientation, and difficulty maintaining balance) would be to transport them to the hospital.  The third fire department member on the scene, engineer Miguel Garcia, similarly testified that Dumain was with Collins for no more than five minutes before the arrest and that Dumain would not have cleared a person to be taken into police custody "who was disoriented and had difficulty with their gait and had slurred speech."

Finally, Collins's law enforcement expert, Jeff Noble, testified that where there is no threat to emergency personnel, standard police procedure requires law enforcement officers to provide the paramedics with sufficient time to assess a subject before making an arrest.  The County's own law enforcement officer, Robert Fonzi, agreed that it would be inappropriate for the deputies to take Collins before the paramedics finished their assessment.

Although Chavez and Sanchez both denied interrupting Dumain's work, the jury could reasonably infer from these other witnesses' testimony that Dumain did not have sufficient time to adequately assess Collins, and that if he had not been interrupted, he would have found that Collins was in

---

[8]    Additional testimony and documentary evidence showed that Chavez and Sanchez themselves were at the scene with Collins just minutes before taking custody of Collins and placing him in Chavez's patrol car.

19

need of immediate medical care.  In sum, the testimony of the fire department personnel and the parties' law enforcement experts, and the undisputed facts that Dumain was with Collins for only minutes before Chavez and Sanchez took him into custody sufficiently supported the jury's verdict that the deputies negligently interfered with the paramedic's assessment.[9]

The County also argues that Collins's "interference theory" of negligence is merely a recasting of a failure to summon medical care theory, which it contends Collins abandoned before trial.  This argument also lacks merit.  Even if the two theories are the same, the record does not support the County's contention that Collins abandoned the theory.

The County bases this assertion on a discussion during trial about the verdict form.  At that time, the County's counsel stated he wanted to clarify that the verdict form had eliminated a claim under "the Bane Act and the failure to summon medical care" claim.  Vaage responded, "Understanding that the Court has denied your motion for nonsuit, if that's the case, then we're prepared to do this."  After the court asked which counsel would prepare the form, County counsel asked again, "Can we just make a record that there's not a failure to summon medical care theory to the verdict form, there's not a Bane Act theory going to the jury in the verdict form?"  Collins's

---

9     The County asserts that the interference theory of liability "can only make sense if the jury also found that plaintiff was in need of immediate medical care."  This was, however, a fair inference drawn by the jury from the evidence.  Adams and Dumain testified that subjects they are called to assist who are hallucinating are taken to the hospital as a general rule.  Dr. Fisk also opined that routine testing that would have occurred at the hospital upon admittance would reveal Collins's dangerously low sodium level and that had Collins been admitted the night before, his sodium levels would not have been as dangerously low.

counsel responded "This is the verdict form we're agreeing to, but in this case we never know when things are going to change . . . ."

The County asserts it relied on this colloquy to withdraw five of its proposed jury instructions addressing the "failure to summon" theory of liability. The only citation, however, that the County gives for this fact is Collins's counsel's declaration submitted in support of the County's reply brief to *Symmonds*'s motion for JNOV. In that brief, the County argued Collins abandoned the theory as to Symmonds, noting that the quoted colloquy came "immediately after a discussion with the Court regarding the fact that Mr. Symmonds may be immune from liability pursuant to Section 855.6." Likewise, the rest of the declaration relates to Symmonds, not the negligence claim against Chavez and Sanchez.

Further, as Collins points out, his attorney refuted the County's assertion that Collins was abandoning the claim, stating they intended only to drop the separate causes of action for Civil Rights Violation by Deliberate Indifference to Serious Medical Need and Violation of the Bane Act. Vaage confirmed the same at the hearing on the JNOV, stating:

> "The claim is that I abandoned a negligence cause of action for failing to get—to summon medical care for Mr. Collins when, in fact, what we did was we eliminated the constitutional violation cause of action that talks about conscious disregard and deliberate indifference. [¶] We did not abandon the negligence cause of action related to summoning medical care. And the reason I know this is because I solicited expert testimony about that issue and about the sheriff's duty to summon medical care even after they took him away from the paramedics. [¶] And then Nurse—he's also saying that Nurse S[ymmonds] wasn't negligent because I had abandoned the negligence cause of action against him for failing to get him medical care when I didn't do that. Not only did I present evidence on it, I argued it."

On this record, the trial court's finding that Collins did not abandon his theory of negligence based on the officers' failure to summon medical care, rather than arrest Collins, was not error.[10]

The officers could reasonably believe Collins was in violation of the drunk in public statute (Pen. Code, § 647, subd. (f))—because he appeared both intoxicated and unable to care for his safety—and simultaneously have been negligent by interrupting the paramedics and arresting Collins, rather than allowing the paramedics to continue their assessment or summoning additional medical care. The jury's negligence verdict was thus not foreclosed by its rejection of Collins's false arrest claim, and was also sufficiently supported by the evidence.

## II

The County next contends that the court made two prejudicial instructional errors concerning immunity under the Tort Claims Act that require reversal. It argues the court erred by (1) instructing the jury that the sheriff's deputies could be liable for the harm that resulted from the acts of the Palomar Health physicians, which was precluded by section 845.6, and (2) failing to give an instruction based on section 844.6, which it contends provided absolute immunity for injuries Collins sustained in jail.

## A

The County argues the deputies could not be held liable for any injury caused by the settling doctors because section 845.6 "immunizes public

---

[10] Because we reject the County's argument that the negligence verdict was inconsistent with and thus precluded by the jury's "probable cause" findings, we need not (and decline to) reach its argument that Collins's other alternate theory of liability—based on the deputies' failure to communicate their earlier interaction with Collins—was not an actionable breach of duty.

employees from liability 'for injury proximately caused by the failure of the employee to furnish medical care,' except when the employee 'knows or has to know that the prisoner is in need of immediate medical care,' and unreasonably fails 'to summon such medical care.' " The County contends that an instruction given, CACI No. 3929, caused the jury to run afoul of this immunity and award Collins damages for injuries that were immunized by section 845.6.

Collins responds that section 845.6 is only applicable to immunize public employees for injuries occurring after a person is jailed, therefore, it did not preclude the jury from finding the injuries caused by the settling doctors were the result of conduct that occurred before Collins was jailed. In addition, Collins asserts that section 845.6 only provides immunity if medical care was timely summoned, and here it was not.

1. *Additional Procedural Background*

Before trial, the County brought a motion in limine to exclude evidence in accordance with section 845.6 that might suggest the County was "liable for alleged medical malpractice by non-County physicians after County employees summoned medical care." Collins did not oppose the motion to the extent it dealt with the conduct of the physician (Dr. Tran) who examined him at the jail before he was taken to the hospital. The court granted the motion.

During the hearing on the jury instructions, the County objected to a standard instruction proposed by Collins, CACI No. 3929, which stated: "If you decide that Defendants are legally responsible for Plaintiff David Collins's harm, they are also responsible for any additional harm resulting from the acts of others in providing medical treatment or other aid that

23

Plaintiff's injury reasonably required, even if those acts were negligently performed."

The County's counsel opposed the instruction, arguing that it "invites the jury to get into holding the County responsible for any additional harm resulting from the acts of others in providing medical treatment, but the County's duty was to send him out for medical treatment, not to make sure once he got there, that it was adequate . . . ." Collins's counsel argued the instruction was properly given, asserting that the immunity did not apply because the defense provided no evidence of any negligent conduct by the Palomar Health physicians or Dr. Tran. The court rejected the County's position and provided the instruction to the jury.

2. *Legal Standards*

"Section 844.6, subdivision (a)(2) establishes the State's immunity to liability for injuries to prisoners. Section 845.6 both affirms the public entity immunity to liability for furnishing medical care, and creates a narrow exception to that immunity. [¶] Section 845.6 states in relevant part, 'Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856 [concerning mental illness and addiction], a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.' " (*Castaneda v. Department of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1070 (*Castaneda*).)

24

"The first clause of section 845.6 establishes the immunity generally of both the public entity and its employees from liability 'for injury proximately caused by the failure of the employee *to furnish or obtain medical care* for a prisoner in his custody.' (Italics added.) The second phrase creates a limited public-entity liability when: (1) the public employee 'knows or has reason to know [of the] need,' (2) of 'immediate medical care,' and (3) 'fails to take reasonable action to summon such medical care.' (§ 845.6, italics added.) [¶] Section 845.6 is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employee's malpractice in providing that care." (*Castaneda*, *supra*, 212 Cal.App.4th at p. 1070.)

"Challenges to jury instructions are subject to a de novo standard of review." (*Sander/Moses Productions, Inc. v. NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094.) However, "[i]t is the responsibility of counsel to propose correct instructions and the court has no duty to modify erroneous instructions submitted to it, and there is no error if it simply rejects such instructions." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335.) In addition, a trial court may refuse instructions that misstate the law or confuse the jury. (*People v. Gurule* (2002) 28 Cal.4th 557, 659 (*Gurule*).) Finally, an appellant must demonstrate that any alleged error in the jury instructions was prejudicial, i.e. that it was probable the appellant would have achieved a more favorable result without the error. (*Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 770, overruled on other grounds by *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85.)

3. *Analysis*

The County asserts the deputies cannot be held liable for any injury that resulted from the Palomar Health physicians' conduct because section 845.6 grants it immunity for such injury. The County's argument misconstrues the statute and its application to the facts here. As explained, the statute immunizes public entities and their employees for failing to furnish or obtain medical care *for a prisoner*, unless the employee knows or has reason to know immediate care is needed and he or she fails to summon such care. (See *Castaneda, supra*, 212 Cal.App.4th at pp. 1070-1071.)

In this case, the deputies' negligent conduct asserted by Collins and accepted by the jury, and which was supported by the evidence, occurred prior to Collins becoming a prisoner. As discussed, the jury concluded that Chavez and Sanchez were negligent by interrupting the paramedics and failing to summon urgently needed medical care, instead arresting Collins and taking him to jail. This conduct was not subject to section 845.6, which applies only in the context of a *prisoner* who is injured.

The negligent conduct asserted by Collins, and found by the jury, was not encompassed by the immunity set forth in section 845.6. Thus, there was no bar to instructing the jury with the general rule set forth in CACI No. 3929 "that where one who has suffered personal injuries by reason of the tortious act of another exercises due care in securing the services of a doctor and his injuries are aggravated by the negligence of such doctor, the law regards the act of the original wrongdoer as a proximate cause of the damages flowing from the subsequent negligent medical treatment and holds him liable therefor." (*Ash v. Mortensen* (1944) 24 Cal.2d 654, 657.) The court's instruction advising the jury to include damages for the injuries

26

Collins sustained in the hospital—evidence of which was not objected to by the County—was not error.

B

The County next argues that the court prejudicially erred by failing to give an instruction it proposed based on section 844.6. As discussed in the preceding section, this statute provides immunity for public entities for injuries that occur in prison. The instruction the County proposed stated: "A public employee is not liable for any injury proximately caused by another prisoner or any injury to a prisoner." The County argues that because the jury found there was probable cause for Sanchez and Chavez to arrest Collins, the County's employees were immune from liability under this provision for any injury that occurred in prison. Thus, the failure to instruct on this point allowed the jury to improperly find liability for the subarachnoid hemorrhage the County contends was caused by one of the falls that occurred in jail.

Collins responds that the failure to give the instruction the County proposed was not error because the instruction was not in accord with the law. Specifically, section 844.6 provides immunity to a public entity, but does not, as the proposed instruction stated, immunize individual employees. Thus, had the proposed instruction been given, it would have provided an incorrect statement of the law and the court's rejection of it was not error. We agree.

27

1. *Additional Procedural Background*

During trial, the County requested the special instruction based on section 844.6.[11] Collins opposed the instruction, asserting that if there was no probable cause to arrest him, he was not a prisoner for purposes of the statute at any time and the immunity under section 844.6 was not applicable. The County's counsel agreed there could be liability if the deputies lacked probable cause for the arrest, but took the position there could be no liability for any injury caused by a fall in jail if there were probable cause, except based on medical malpractice.

The court stated it was "not going to give [the instruction], but depending on how [Collins] argues, I might give it." The County did not request the instruction after the close of evidence, and the court did not give the instruction. After trial, the County argued the failure to give the instruction was error and required a new trial because the jury's conclusion that the arrest was lawful meant the County's employees were immune for any injury sustained in jail under section 844.6. Thus, the court's failure to instruct on that immunity led the jury to improperly conclude the County

---

11    Before trial, the County filed a motion in limine seeking to preclude evidence attempting to establish liability for the subarachnoid hemorrhage on the grounds that the County was immune from liability under section 844.6 for any injury that was the result of a fall in jail. During the hearing on the motion, the County's counsel explained that the County could be liable if the fall occurred before Collins was arrested or after, under section 845.6, if County employees failed to immediately summon medical care, but that the County was otherwise protected under 844.6. County counsel further explained it was not seeking to preclude evidence concerning the injury or when it occurred, only evidence suggesting the County could be liable. The trial court denied the motion, noting that the issue might be better addressed by a jury instruction.

was liable for any damages attributable to the subarachnoid hemorrhage Collins sustained in jail. The trial court rejected this argument.

2. *Analysis*

While no published decision addresses the distinction between an entity and its employees for purposes of section 844.6, the statute itself is clear. Section 844.6, titled "Injury by or to prisoner," states in relevant part:

> "(a) Notwithstanding any other provision of this part . . . a public entity is not liable for:

> "(1) An injury proximately caused by any prisoner.

> "(2) An injury to any prisoner.

> "(b) Nothing in this section affects the liability of a public entity under Article 1 (commencing with Section 17000) of Chapter 1 of Division 9 of the Vehicle Code.

> "(c) Except for an injury to a prisoner, nothing in this section prevents recovery from the public entity for an injury resulting from the dangerous condition of public property under Chapter 2 (commencing with Section 830) of this part.

> "(d) *Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission.* The public entity may but is not required to pay any judgment, compromise or settlement, or may but is not required to indemnify any public employee, in any case where the public entity is immune from liability under this section; except that the public entity shall pay, as provided in Article 4 (commencing with Section 825) of Chapter 1 of this part, any judgment based on a claim against a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state for malpractice arising from an act or

29

omission in the scope of his employment, and shall pay any compromise or settlement of a claim or action, based on such malpractice, to which the public entity has agreed."

(Emphasis added.)[12]

The Assembly's Legislative Committee comments also make plain that the statute does not provide the individual immunity the County seeks. Those comments state: "The section does not affect the liability of public employees, and an employee may be held liable for an injury to a prisoner or an injury caused by a prisoner even though the public entity is not liable." (Legis. Com. com., West's Ann. Code of Civil Procedure (2021 ed.) Gov. Code, § 844.6; see also Cal. Civ. Prac. Torts, § 31:29 ["Under Gov. Code, § 844.6, subd. (a), a public entity is immune from liability for an injury by or to a prisoner. However, nothing in Gov. Code, § 844.6 exonerates a public employee from liability for injury proximately caused by his or her negligent or wrongful act or omission."]; § 38:84 Injuries suffered by prisoners, 2 Cal. Affirmative Def. § 38:84 (2d ed.) ["The fact that § 844.6 creates an immunity for public entities does not exonerate public employees for injuries caused by their negligent or wrongful acts or omissions."].) Given this clear language, had the proposed instruction been provided, it would have been an incorrect statement of the law. Accordingly, the court's rejection of the instruction was not error. (See *Gurule*, *supra*, 28 Cal.4th at p. 659.)

In its reply brief, the County concedes this flaw in its argument, and instead emphasizes its assertion that JNOV was required because Collins conceded there could be no liability for any fall in jail if the jury found probable cause to arrest. As discussed in section I, *ante*, the jury's negligence verdict as to the deputies was properly based on their interference with the

---

12    At noted, the County agreed to indemnify its employees.

30

paramedic's assessment. Thus, even if there were an instructional error, it was not prejudicial since the deputies could be held liable for subsequent injury that resulted from their prearrest conduct. Further, as discussed in section A, the law contains an exemption for failure to summon care. Thus, even if the injury was sustained in jail (a factual question that was in dispute and not resolved by the jury), the County could still be properly held liable on that basis.

Finally, the County did not provide any evidence at trial to allow the jury to determine what damages were related to the subarachnoid hemorrhage injury. The County's brief states that the evidence regarding the "subarachnoid injury (i.e., the 'brain bleed') is not in dispute. The medical experts agreed that plaintiff had a small brain bleed, and that it was likely caused by a fall." However, the County provides no argument or discussion about what portion of Collins's damages could be attributed to the brain bleed. Indeed, the County states that it was the brain stem injury "that led to permanent neurological damage, upon which virtually all of plaintiff's claims for damages rests."[13] Because it failed to make this distinction, the argument is also forfeited. (See *Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158 ["To preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages."].)

III

After the verdict was rendered, Symmonds moved for JNOV of the jury's finding that he was negligent "in his diagnosis and treatment of"

---

[13]    The County also notes that the severe hyponatremia that led to the ODS was Collins's most serious injury and the cause of his brain stem injury.

Collins because section 855.6 immunized Symmonds from any liability based on his evaluation of Collins's fitness for jail. The County advances the same argument on appeal. Collins responds that the statute does not provide immunity because Symmonds's evaluation was for treatment, which is explicitly exempted under the statute. Alternatively, Collins argues that the jury's finding of negligence was supported by evidence of Symmonds's failure to summon medical care.

A

Section 855.6 states: "Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others."

The Law Revision Commission comments to the statute explain that the statute "grants an immunity for failure to perform adequately public health examinations, such as public tuberculosis examinations, physical examinations to determine the qualifications of boxers and other athletes, and eye examinations for vehicle operator applicants. It does not apply to examinations for the purpose of treatment such as are made in doctors' offices and public hospitals. In those situations, the ordinary rules of liability would apply. [¶] The immunity provided by this section relates only to failure to make any examination or, if an examination is made, to the 'adequacy' of the examination; the section does not provide immunity, for example, where a public employee negligently injures a person while making an examination." (4 Cal.L.Rev.Comm. Reports 865 (1963); see also *Colome v.*

*State Ath. Comm'n* (1996) 47 Cal.App.4th 1444, 1458 [applying immunity under § 855.6 to a physician serving as boxing commission examiner for purposes of boxer's claim that denial of license to fight interfered with his economic advantage; "It is impossible to conceive of a more explicit indication of statutory intent that would apply than this one does to the case herein. It is undisputed that the purpose of the examination was to determine the fitness of [plaintiff] to be licensed."].)

B

The examination conducted by Symmonds, a registered nurse, was, as the County asserts, to determine if Collins was fit for jail. But the examination also served the dual purpose of determining whether Collins needed to receive medical treatment. As Collins points out, the policy and procedure manual for the Medical Services Division of the County Sheriff's Department states that the purpose of a medical intake examination is "to identify an inmate's health conditions and *medical needs* at the time of booking." (Emphasis added.) Under the manual, if Symmonds was uncertain about Collins's condition, Collins should have received further examination and if an arrestee is "unconscious, semi-conscious, bleeding, *or in obvious need of immediate medical attention*" the department's policy requires the intake examiner to refer the arrestee "immediately for emergency medical care." (Emphasis added.) In our view, these facts take the examination outside the bounds of the immunity created by section 855.6. Symmonds's role was to determine if Collins needed medical treatment, or in the language of the statute's exemption, it was "an examination or diagnosis for the purpose of treatment" and thus not protected by section 855.6.

The County relies on *Lucas v. City of Long Beach* (1976) 60 Cal.App.3d 341 (*Lucas*) for the proposition that Symmonds was immune from liability

under section 855.6 for conducting an inadequate assessment of Collins's fitness for jail.  *Lucas* involved the arrest of a 17 year old who was seen walking across a busy street around 1:00 a.m. and appeared to be intoxicated. (*Lucas*, at p. 344.)  He was taken to jail and given a breathalyzer.  The test was negative, so jail officials assumed he was under the influence of drugs. (*Ibid.*)  Four hours later, he was discovered deceased, hanging from a noose in his cell.  (*Id*. at p. 345.)  An autopsy revealed sedatives in his system.  (*Ibid.*)

The decedent's mother brought suit for wrongful death.  After trial, the jury found that the police officer responsible for overseeing the decedent was negligent in various ways, including by failing to summon medical care at the outset of his incarceration.  (*Lucas*, *supra*, 60 Cal.App.3d at pp. 345-347.) The Court of Appeal overturned the verdict, concluding that section 855.6 immunity applied to the officer's intake assessment because the plaintiff had presented "no evidence as to what kind of medical care she claims should have been provided and more importantly she offered no evidence as to how such medical care could have prevented the death."  (*Id*. at p. 350.)

Here, Collins provided evidence of both—he introduced expert testimony that Collins was not exhibiting symptoms of intoxication and that earlier medical intervention would have prevented his injuries, and that Symmonds failed to follow the jail's own policies to assess the medical condition of potential inmates.  Further, the assessment here was made by a

34

registered nurse, not a sworn police official, for the explicit purpose of determining Collins's need for medical treatment.[14]

The County also looks to *Kravitz v. State of California* (1970) 8 Cal.App.3d 301 (*Kravitz*) to support its position. In this tragic case, a young girl was killed by a man recently released from a state hospital who had been previously adjudged insane and committed following charges of felony assault and attempted murder. (*Id.* at p. 303.) The man was released after state doctors adjudged him "no longer insane [and] no longer a menace to the health and safety of others." (*Id.* at p. 304.) The Court of Appeal sustained a demurrer to the civil negligence complaint brought by the victim's parents

---

[14] The County's reliance on dicta in an unpublished federal district court opinion, *Dasenbrock v. Enenmoh* (E.D. Cal., Dec. 12, 2017, No. 1:11-cv-01884-DAD-GSA-PC) 2017 WL 6375635 (*Dasenbrock*), is similarly misplaced. *Dasenbrock* granted summary judgment on the inmate plaintiff's negligence claims against a correctional officer who was staffed at the prison's medical clinic. The court determined the correctional officer was immune from liability under section 845.6 because his role was not the provision of medical care, and the plaintiff presented no evidence of a need for emergency medical attention. After first noting it was not necessary to reach the application of section 855.6 because of the immunity afforded under section 845.6, the court found that that the statute would also provide immunity to the correctional officer from any failure "to examine Plaintiff or refer him for further care." (*Id.* at p. *21.) *Dasenbrock* bears little resemblance to the claims in this case.

The County also relies on another unpublished federal district court opinion granting a motion to dismiss, *Estate of Bock ex rel. Bock v. County of Sutter* (E.D. Cal., Feb. 8, 2012, No. 2:11-cv-00536-MCE-GGH) 2012 WL 423704 (*Bock*). *Bock* applied section 855.6 to the decedent prisoner's negligence claim against several apparent employees of a county mental health facility where the decedent had been involuntarily committed under Welfare and Institutions Code section 5150 before committing suicide in jail. Without any explanation of the roles of the defendants or analysis of the application to the immunity provision to their conduct, the court found the statute applicable to them and dismissed the plaintiffs' claim. (*Id.* at p. *11.) Given its lack of analysis, we do not find this case to be persuasive authority for the County's position.

against the state and employees of the state hospital for approving the release.

The court concluded that no civil liability could attach with respect to the official duties of the hospital staff in determining whether to release a committed offender under Penal Code section 1026a. Then, after stating that it did not need to reach the issue, the court also concluded that the medical staff would be immune under section 855.6. (*Kravitz*, *supra*, 8 Cal.App.3d at p. 306.) In dicta, the court noted that the statute was "directed exactly at a situation in which, as the result of a faulty diagnosis, a mentally defective person is either not placed in custody or is released therefrom and therefore causes harm to another or to himself." (*Id*. at pp. 306-307.)

Unlike the exam in *Kravitz*, a primary purpose of the exam here was to diagnose Collins, i.e., to determine if he was in need of immediate medical care. The examinations at issue in *Kravitz* are more analogous to the public health examples provided in the Law Revision Commission's comments. Like the Boxing Commission physician's role to determine if a fighter is eligible for a license or an eye exam conducted by the Department of Motor Vehicles to obtain a driver's license, the medical staff in *Kravitz* were tasked with making a discrete determination about the committed person's mental health. In contrast, the examination by a registered nurse here was for medical treatment.[15]

---

[15] The County argues that "the statute exempts examinations that are 'for purposes of treatment,' " and not "examinations that are for the purpose of determining whether or not treatment is needed.' " This is an artificial distinction and we do not find it determinative of the availability of the immunity. Unlike an examination for purposes of a specific public safety reason (e.g., obtaining a driver's license), Symmonds's examination was for purposes of medical treatment.

36

Finally, the County asserts that the trial court incorrectly calculated the settlement setoff because it failed to sufficiently account for the liability limitations imposed by MICRA in its calculation of noneconomic damages. Collins responds that the court acted within its discretion, and existing case law supports the formula the court employed because the MICRA cap "applies only to judgments awarding noneconomic damages," not settlements. (*Rashidi v. Moser* (2014) 60 Cal.4th 718, 727 (*Rashidi*).)  Further, Collins argues that utilizing the formulas suggested by the County would give an undue benefit to Chavez and Sanchez.

A

As discussed, after the jury rendered its damage verdict, the County moved for a reduction in damages based on MICRA, and for a damage setoff under Proposition 51 for the settlement Collins reached with Palomar Health and its doctors.  Collins did not oppose the reduction under MICRA, and the trial court reduced the portion of the noneconomic damage award attributed to Carolino and Symmonds by the jury ($5.6 million, or 70% of the total $8 million) to $250,000.

With respect to the requested setoff, Collins agreed some setoff was appropriate, but not the amount proposed by the County.  In its moving papers, the County first asked the court to calculate the setoff by applying the MICRA reduction to the nurses' noneconomic damages before using the standard formula, set forth in *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268 (*Espinoza*), to determine noneconomic damages, yielding a total judgment of $5,507,674.  In response to Collins objection to that approach, the County then proposed a "hybrid" calculation, which yielded a total award of $5,172,174.

After a hearing on the motion, the court sided with Collins, declining the County's proposals to first reduce the noneconomic damages under MICRA before determining the percentage of damages the jury allocated to noneconomic damages. To calculate the setoff, the court first determined the percentage of the damage award attributable to noneconomic damages relative to the entire award at 36.6 percent (noneconomic damages of $8 million and economic damages of $4,617,674; percentage of economic damages relative to the total ($4,617,674/$12,617,674 = 36.6%)). The court then apportioned 36.6 percent of the $2,750,00 settlement as economic damages ($1,006,500) and deducted that amount from the economic damages awarded by the jury ($4,617,674 - $1,006,500) to arrive at total economic damages of $3,611,174. The economic damages were then combined with noneconomic damages of $2,650,000 for a total award of $6,261,174.[16]

### B

"In professional negligence actions against health care providers, recovery of noneconomic damages is capped at $250,000. (Civ. Code, § 3333.2, enacted as part of the [MICRA].)" (*Rashidi*, *supra*, 60 Cal.4th at p. 720.) In addition, "Code of Civil Procedure section 877 allows a nonsettling tortfeasor to set off the amount of a jointly liable tortfeasor's settlement against damages awarded at trial. However, tortfeasors are jointly liable for only economic damages. Civil Code section 1431.2 [enacted by Proposition 51] imposes 'a rule of strict proportionate liability' on noneconomic damages. [Citation.] '[E]ach defendant is liable for only that portion of the plaintiff's

---

[16]   The calculation for noneconomic damages is 70 percent of the $8 million noneconomic damage award, or $5.6 million, reduced by MICRA to $250,000 added to the 30 percent portion attributed to the deputies, at $2.4 million, totaling $2,650,000.

38

noneconomic damages which is commensurate with that defendant's degree of fault for the injury.' " (*Rashidi*, at p. 722.)

Accordingly, "when a pretrial settlement does not differentiate between economic and noneconomic losses, a postverdict allocation is required because 'only the amount attributable to the joint responsibility for economic damages may be used as an offset.' " (*Rashidi*, *supra*, 60 Cal.4th at p. 722.) "A widely accepted method for making such a postverdict allocation was provided in *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 276-277 (*Espinoza*). The percentage of the jury's award attributable to economic damages is calculated and applied to the settlement, yielding the amount that the nonsettling defendant is entitled to offset." (*Rashidi*, at p. 722, citing *Espinoza*, at p. 277.)

"We generally review a ruling granting or denying a section 877 settlement credit under the deferential abuse of discretion standard. [Citation.] To the extent that we must decide whether the trial court's ruling was consistent with statutory requirements, we apply the independent standard of review." (*Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1044.

C

As it did in the trial court, the County argues the court was required to apply MICRA to the jury's noneconomic award before it calculated the percentages of economic and noneconomic losses to be applied to the settlement. The County presents three different methodologies that increase the setoff amount. Two of these methodologies were not presented in the trial court. The third, the "hybrid" calculation, was rejected by the trial court.

To advance its argument, the County relies primarily on *Mayes v. Bryan* (2006) 139 Cal.App.4th 1075 (*Mayes*). As in *Mayes*, "[t]he issue here is

39

the interplay between MICRA (Civ. Code, § 3333.2), Proposition 51 (Civ. Code, § 1431.2), and settlements with other tortfeasors who are subject to MICRA. (Code Civ. Proc., § 877.)" (*Mayes*, at p. 1099.) *Mayes* was a medical malpractice case in which all but one of the physicians involved settled before trial. After a jury verdict was rendered in favor of the plaintiffs, the nonsettling defendant sought an offset. To determine the setoff amount, the trial court first reduced the jury's verdict by MICRA, then determined what percentage of the verdict was for economic damages. (*Ibid.*) The plaintiff appealed, asserting the reduction under MICRA before allocating the percentage of economic damages awarded by the jury was error. (*Ibid.*) The Court of Appeal rejected the argument, affirming the trial court's calculation. (*Id.* at p. 1080.)

Unlike this case, however, all of the defendants in *Mayes*, both settling and nonsettling, were subject to the MICRA limit. Critically, and distinct from this case, the jury was also tasked with determining the settling defendants' proportionate liability. (*Mayes*, *supra*, 139 Cal.App.4th at p. 1098.) In affirming the trial court's decision, the appellate court emphasized that failing to reduce under MICRA before apportioning the settlement ran afoul of Proposition 51 because it would result in the settling defendants paying noneconomic damages that were inconsistent with the portion of fault set by the jury. (*Id.* at p. 1103.) No such concern is present in this case.

We agree with the trial court that a recent decision of our Supreme Court, *Rashidi*, supports the calculation it used. In *Rashidi* a medical malpractice plaintiff settled first with the hospital (a defendant subject to MICRA) and the manufacturer of a medical device used in the procedure (a defendant not subject to MICRA). (*Rashidi*, *supra*, 60 Cal. 4th at p. 721.)

40

The case went to trial against one nonsettling physician. After the jury verdict against the doctor where, like here, the trier of fact was not asked to apportion the settling defendants' degree of fault, the doctor sought to setoff the judgment with the two prior settlements. (*Ibid.*) The trial court rejected the request, "finding no basis for allocating the settlement sums between economic and noneconomic losses." (*Id.* at pp. 721-722.)

The Court of Appeal disagreed, holding offsets were required for economic and noneconomic damages. Following the *Espinoza* formula, for the non-MICRA defendant, the Court of Appeal reduced the economic damages awarded to the plaintiff using the same percentage of economic/noneconomic losses found by the jury for the doctor. (*Rashidi*, *supra*, 60 Cal.4th at pp. 722-723.) For the hospital setoff, the Court of Appeal first reduced the noneconomic award to $250,000 under Civil Code section 3333.2, then used the reduced figure to allocate the percentage of noneconomic and economic losses. The court then applied that percentage to the hospital's settlement and deducted the noneconomic portion from the noneconomic damages awarded by the jury. (*Rashidi*, at p. 724.)

The Supreme Court then granted the plaintiff's petition for writ review and reversed the Court of Appeal's setoff calculation. The court rejected the argument that total noneconomic "damages" with all defendants subject to MICRA (whether settling or not) were limited to $250,000. Citing the plain language of Civil Code section 3333.2, which refers explicitly to damages, not losses, the court held that MICRA did not require noneconomic losses to be subject to a settlement setoff: "Neither the parties nor amici curiae direct us to anything in the legislative history of section 3333.2 that indicates an intent to include settlement recoveries in the cap on noneconomic damages. To the contrary, we have noted that the Legislature had jury awards in mind

41

when it enacted the [MICRA] cap, and that only a collateral impact on settlements was contemplated . . . the Legislature was primarily concerned with capricious jury awards when it established the MICRA cap. . . . Allowing the proportionate liability rule of section 1431.2 (Prop. 51) to operate in conjunction with the cap on damages imposed by section 3333.2 enhances settlement prospects." (*Rashidi, supra,* 60 Cal.4th at pp. 726-727.) Further, the Supreme Court held that reading the statute this way eliminated the "conflict discerned by the Court of Appeal between sections 1431.2 and 3333.2 . . . ." (*Rashidi,* at p. 725.)

*Rashidi,* although not perfectly aligned with the facts here, strongly suggests that application of MICRA before calculating the setoff is not required because MICRA applies to damages awarded at trial, and not settlements, which are "not the same as damages." (*Rashidi, supra,* 60 Cal.4th at p. 724.) The *Rashidi* court stated " ' "[s]ettlement dollars represent a contractual estimate of the value of the settling tortfeasor's liability and may be more or less than the proportionate share of the plaintiff[']s damages. The settlement includes not only damages, but also the value of avoiding the risk, expense, and adverse public exposure that accompany going to trial. There is no conceptual inconsistency in allowing a plaintiff to recover more

42

from a settlement or partial settlement than he could receive as damages." ' "[17] (*Ibid*.)

The County's argument that the court's calculation failed to account for the reduction the settling doctors would have received if they had gone to trial and MICRA had been applied is logically appealing. It seems sensible that all of the defendants that are subject to MICRA (including those that have already settled) should be responsible for the same or similar percentage of economic and noneconomic damages. However, a settlement and a damage award are not the same. What the trier of fact would have awarded Collins for the settling defendants' conduct, and what portion of fault it would have allocated to them is entirely speculative.[18] Unlike the

---

[17] Another case cited by the County, *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, also highlights the problem with applying MICRA before determining the apportionment of economic and noneconomic damages. The case addresses a damage setoff from a workers' compensation award, not a settlement, and contains no reference to MICRA. The *Torres* court determined that the trier of fact's apportionment of noneconomic and economic damages should be applied to the workers' compensation award (following the same approach used for a codefendant's prior settlement under *Espinoza*, *supra*, 9 Cal.App.4th 268) and reduced the economic damages award accordingly. (*Torres*, *supra*, 49 Cal.App.4th at p. 37.) Citing *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 63 (*Hoch*) (also relied on by the *Rashidi* court), the *Torres* opinion explained why a settlement (or workers' compensation award) cannot be equated to damages: " 'Settlement dollars are not the same as damages. Settlement dollars represent a contractual estimate of the value of the settling tortfeasor's liability . . . . [A] settlement includes not only damages, but also the value of avoiding the risk, expense, and adverse public exposure that accompany going to trial.' " (*Torres*, at p. 37.)

[18] Whether the settling defendants would be willing to characterize a greater percentage of the settlement as noneconomic damages in light of MICRA is also speculative (though perhaps less so).

calculation advanced by the *Mayes* appellant, the calculation by the trial court here did not run afoul of either MICRA or Proposition 51.  The County defendants were not held liable for any portion of noneconomic *damages* attributed to another defendant by the finder of fact, and received the benefit of MICRA.  Accordingly, we reject the County's assertion that the setoff calculation applied by the court was an abuse of its discretion.

DISPOSITION

The judgment is affirmed.  Appellants shall bear the costs of appeal.

McCONNELL, P. J.

WE CONCUR:


BENKE, J.


O'ROURKE, J.

44